STATE OF MAINE *vs*. SANDY KING.

Aroostook.      Opinion, December 7, 1936.

6

*George B. Barnes*, County Attorney for State.
*John O. Rogers*, for defendant.

Sitting: Dunn, C. J., Sturgis, Barnes, Thaxter, Hudson, Manser, JJ.

Hudson, J.  On report. The respondent stands indicted by the Grand Jury of Aroostook County for violation of Sec. 5, Chap. 259, P. L. 1933, as amended by Chap. 146, P. L. 1935; the chapter entitled "An Act Relative to Regulation of the Use of the Highways by Motor Vehicles Transporting Property for Hire." By

agreement, if this Court declares that "prosecution can be maintained, the case is to be remanded for disposition in accordance with the statute."

This chapter divides such users of the highways into two classes; first, *common carriers* "over regular routes between points within this state" (See Sec. 2), (in Sec. 6 special provision is made as to interstate carriers) ; and, second, *contract carriers*, defining them to be "all persons, firms or corporations operating, or causing the operation of, motor vehicles transporting freight or merchandise for hire upon the public highways, other than common carriers over regular routes ; except that the term shall not be construed to include any person, firm or corporation regularly engaged in the transporation business but who on occasional trips transports the property of others for hire." (See Sec. 5.)

In Sec. 5, sub-division (A), it is provided:

> "No contract carrier shall operate, or cause to be operated, any motor vehicle or vehicles for the transportation of property for hire on any public highway within this state without having obtained a permit from the commission."

The respondent did not have the required permit. It is admitted that he is a contract carrier and in that capacity operated his leased truck on the public highways leading from Houlton to Patten (conveying cream from his collecting station in Houlton to the creamery in Patten). On these facts, the State contends he is guilty.

Guilt is denied by the respondent on the ground that the statute, so far as it concerns contract carriers, violates both State and Federal Constitutions in depriving him of "due process of law" and "equal protection of the laws."

As it relates to common carriers, this chapter has recently been passed upon by this Court. As to them, *In Re John M. Stanley, Exceptant*, 133 Me., 91, 174 A., 93, 95, holds it constitutional. This decision was affirmed by the United States Supreme Court, 295 U. S., 76, 55 S. Ct., 79 L. Ed., 1311. Now we are to pass upon its contract carrier provisions.

As to due process and equal protection, the respondent seeks cover under Article 1, Sec. 1 of the Maine Constitution, which provides:

"All men are born equally free and independent, and have certain natural, inherent and unalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness.",

and the Fourteenth Amendment to the Federal Constitution, that no state shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

He challenges this statute as an unconstitutional deprivation of his right to conduct his business as a contract carrier. At the outset, it is to be noted that the respondent's business is not conducted only with his own property. A very big and essential part of it is in the use of the public highways, to which he has no special right but only that of the public at large.

In holding constitutional an ordinance of the Town of Eden, closing certain public streets to the use of automobiles, Justice King in *State* v. *Mayo*, 106 Me., 62, 75 A., 295, 297, said:

"But the right to so use the public streets, as well as all personal and property rights, is not an absolute and unqualified right. It is subject to be limited and controlled by the sovereign authority — the State, whenever necessary to provide for and promote the safety, peace, health, morals, and general welfare of the people. To secure these and kindred benefits is the purpose of organized government, and to that end may the power of the State, called its police power, be used. By the exercise of that power, through legislative enactments, individuals may be subjected to restraints, and the enjoyment of personal and property rights may be limited, or even prevented, if manifestly necessary to develop the resources of the State, improve its industrial conditions, and secure and advance the safety, comfort and prosperity of its people. And it is fundamental law that no constitutional guaranty is violated by such an exercise of the police power of the State when manifestly necessary and tending to secure such general and public benefits."
Also see *State* v. *Phillips*, 107 Me., 249, 78 A., 283.

In *State* v. *Robb, Appellant,* 100 Me., 180, 60 A., 874, 876, this Court said:

"The constitutional guaranties that no person shall be deprived of life, liberty or property, without due process of law, and that no state shall deny to any person within its jurisdiction the equal protection of the laws were not intended to limit the subjects upon which the police power of a state may lawfully be exerted."

Quoted therein with approval is this language from the *Slaughter House Cases,* 16 Wall., 36, 21 L. Ed., 394, viz:

"The citizen owns his property absolutely, it is true; it can not be taken from him for any private use whatever, without his consent, nor for any public use without compensation; still he owns it subject to this restriction, namely, that it must be so used as not to injure others, and that the sovereign authority may, by police regulations, so direct the use of it that it shall not prove pernicious to his neighbors, or the citizens generally."

In *State* v. *Latham,* 115 Me., 176, 98 A., 578, Chief Justice Savage stated:

"... that the Fourteenth Amendment was not designed to interfere with the proper exercise of the police power by the State was held in *Barbier* v. *Connolly,* 113 U. S., 26, and the doctrine has been reaffirmed since in many cases, both in the Federal and in the State Courts. It is settled doctrine, *State* v. *Montgomery,* 94 Me., 192; *State* v. *Mitchell,* 97 Me., 66; *State* v. *Leavitt,* 105 Me., 76."

In *Maine Motor Coaches, Inc., Petitioner* v. *Public Utilities Commission,* 125 Me., 63, 130 A., 866, 867, Chief Justice Wilson said:

"In view of the well recognized control over highways by the legislature and of the public moneys spent in building permanent thoroughfares throughout the State and the possible menace to public safety and the rapid destruction of the roadbed by the operation of heavy, high-powered motor busses over them, the authority of the Legislature to prohibit the use of the public ways for such purposes cannot be doubted."

This case is cited with approval in Justice Sutherland's opinion in *Stephenson* v. *Binford*, 287 U. S., 251, 264, 53 S. Ct., 181, 184, 77 L. Ed., 288.

In *York Harbor Village Corporation* v. *Libby et al.*, 126 Me., 537, 140 A., 382, 385 (it was claimed that a village zoning ordinance interfered with the constitutional right to conduct private business), Justice Deasy said:

> "It" (meaning the police power) "is not the offspring of constitutions. It is older than any written constitution. It is the power which the states have not surrendered to the nation, and which by the Tenth Amendment were expressly reserved 'to the states respectively or to the people.' Limitations expressed or necessarily implied in the Federal Constitution are the frontiers which the Police Power cannot pass. Within those frontiers its authority is recognized and respected by the constitution and given effect by all courts. We have seen that private property is held subject to the implied condition that it shall not be used for any purpose that injures or impairs the public health, morals, safety, order or welfare. Under the police power statutes and authorized ordinances give this condition practical effect by restrictions which regulate or prohibit such uses. If the use is actually and substantially an injury or impairment of the public interest in any of its aspects above enumerated a regulating or restraining statute or ordinance conforming thereto, if itself reasonable and not merely arbitrary, and not violative of any constitutional limitation, is valid."

In *State of Maine* v. *Chandler*, 131 Me., 262, 161 A., 148, Justice Sturgis said:

> "The right of a state in the exercise of its police power to prescribe uniform regulations necessary for public safety and order in respect to the operation of motor vehicles on its highways has been repeatedly recognized and sustained."

In *State of Maine* v. *Old Tavern Farm, Inc.*, 133 Me., 468, 180 A., 473, 475, Justice Dunn stated:

> "The Fourteenth Amendment was not designed to interfere with due exercise of the police power by the State."

And in the *Stanley Case,* supra,

"The exceptant (a common carrier) had no vested right to use the highways and other roads to carry freight for hire."

*A fortiori* is it true of a contract carrier, for his service is private, not public.

This also from the recent *Stanley Case,* supra:

"The streets belong to the public, and are primarily for use in the ordinary way. No one has any inherent right to use such thoroughfares as a place of business."

The Massachusetts Court in an advisory opinion, 251 Mass., on page 595, 147 N. E., 681, 693, has stated:

"The power of the General Court to regulate travel over the public ways of the Commonwealth for the general welfare is extensive. It may be exercised in any reasonable manner to conserve the safety of travellers. No one has a right to use streets and other public places as he chooses without regard to the presence of others. It is an underlying conception of streets and highways that they shall at all times be reasonably safe and convenient for public travel and that travellers thereon in the exercise of due care may be secure from preventable danger. Numerous statutes to that end have been enacted from early times to the present. All highways now are laid out and established by public authority. . . . The Commonwealth is the sovereign power and the proprietor may do with its own as the General Court may direct, provided its action can be said to be in the public interest and not violative of constitutional guaranties. . . . Reasonable classification in the selection of subjects for legislation is always permissible to a law making power. It is only when such classification is arbitrary or irrational that it comes in conflict with the constitution."

In *Morris et al.* v. *Duby et al.,* 274 U. S., 135, on page 143, 47 S. Ct., 548, 550, 71 L. Ed., 966, the court said:

"In the absence of national legislation especially covering the subject of interstate commerce, the State may rightly prescribe uniform regulations adapted to promote safety upon its

highways and the conservation of their use, applicable alike to vehicles moving in interstate commerce and those of its own citizens. *Hendrick* v. *Maryland,* 235 U. S., 610, 622 et seq.; *Kane* v. *New Jersey,* 242 U. S., 160, 167. Of course the State may not discriminate against interstate commerce. *Buck* v. *Kuykendall,* 267 U. S., 307."

And quoted, with approval, this from the last named case:

"With the increase in number and size of the vehicles used upon the highway, both the danger and the wear and tear grow. To exclude unnecessary vehicles — particularly the large ones commonly used by carriers for hire—promotes both safety and economy. State regulation of that character is valid even as applied to interstate commerce, in the absence of legislation by Congress which deals specifically with the subject."

In *Hodge Drive-It-Yourself Co.* v. *City of Cincinnati,* 284 U. S., 335, 52 S. Ct., 144, 145, 76 L. Ed., 323, decided January 4, 1932, the Supreme Court said, on page 337:

"The State has power for the safety of the public to regulate the use of its public highways. *Hendrick* v. *Maryland,* 235 U. S., 610, 622. *Kane* v. *New Jersey,* 242 U. S., 160, 167. *Sprout* v. *South Bend,* 277 U. S., 163, 168. It may prohibit or condition as it deems proper the use of city streets as a place for the carrying on of private business. . . .

"This ordinance is not an interference with or regulation of a business that has no relation to matters of public concern; it rests upon the power of the city to prescribe the terms upon which it will permit the use of its streets to carry on business for gain.

"A state ought never to be presumed to surrender this power" (its control over public highways), "because, like the taxing power, the whole community have an interest in preserving it undiminished; . . ." See Honnold on Supreme Court Law, Vol. 2 on page 1191, and cases therein cited.

A still later decision by the Supreme Court, on December 5, 1932, binding us but pleasingly in accord with the general principles enunciated in the Maine cases above mentioned, answers the question

whether the state legislature has the power to regulate the business of the contract carrier, so far as he makes use of the state's public highways, without violation of the due process and equal protection provisions of State and Federal Constitutions and says that it does, providing the regulatory statute be not arbitrarily discriminatory. *Stephenson et al. v. Binford*, 287 U.S., 251, 53 S.Ct., 181, 186, 77 L. Ed., 288. In that case it is held that such regulation of the private contract carrier is a legitimate subject for the exercise of the state legislative police power; that in the exercise of it, the legislature may authorize its Public Service Commission to fix the minimum rates of private contract motor vehicle carriers operating in competition with common carriers, which shall not be less than the rates prescribed for common carriers for substantially the same service; that the use of the highways of the state for purposes of gain is special and extraordinary and may generally be prohibited or conditioned by the legislature as it sees fit; that where the end is one for which the legislative power may properly be exercised, the extent to which the provisions of a statute as means conduce to that end, the degree of their efficiency, and the closeness of their relation to the end sought to be attained are matters addressed to the judgment of the legislature and not to that of the courts; that it is enough if it can be seen that in any degree, or under any reasonably conceivable circumstances, there is an actual relation between the means and the end; that as to freedom of contract, when the exercise of that freedom conflicts with the power and duty of the state to safeguard its property from injury and preserve it for those uses for which it was primarily designed, such freedom may be regulated and limited to the extent which reasonably may be necessary to carry the power and duty into effect; and that if one of the aims of legislation is valid, it is not rendered invalid by the circumstance that the legislature had other purposes in view, which, considered apart, it had no constitutional power to make effective.

As we understand that decision (private contract carriers were attempting to prove the unconstitutionality of the Texas statute relating to transportation by common and private carriers), such a statute, although it interferes with the conduct of the business of the contract carrier, is constitutional when its purpose is to regulate the use of the state highways for the general welfare of the

14

public, provided it does not effect any arbitrary discrimination. The court recognizes that a statute whose necessary effect would be to legislate a contract carrier into a common carrier would constitute undue process and so be unconstitutional. It does not overrule its former decisions in *Michigan Public Utilities Commission, Appellants* v. *Duke*, 266 U. S., 570, 45 S. Ct., 191, 69 L. Ed., 445; *Frost & Frost Trucking Co.* v. *Railroad Commission of California*, 271 U. S., 583, 46 S. Ct., 605, 70 L. Ed., 1101; and in *Smith, Appellant* v. *Cahoon*, 283 U. S., 553, 51 S. Ct., 582, 75 L. Ed., 1264; but, adhering, distinguishes them. From its examination of the Texas statute it discovers no intention of its legislature to legislate the contract carrier into a common carrier, as we do not in our statute. Provisions as to each were independently made in the Texas statute. Although there they happened to be included in one statute, yet they were independent in operation and in effect. The court points out that the harm in non-separation of provisions is their uncertainty, and says:

"The vice of the statute" (the Florida statute dealt with in *Smith* v. *Cahoon*, supra) "was that all carriers for hire, whether public or private, were put upon the same footing by explicit provisions which could not be severed so as to afford one valid scheme for common carriers and another for private carriers, with the result that until the separability of these provisions should be determined by competent authority, they were void for uncertainty. In the Texas statute no such uncertainty exists."

The Texas statute was held constitutional because as framed and enacted without arbitrary discrimination, it was a proper employment of the State's right under the police power to regulate the use of its highways and the court found it unnecessary to pass upon the question as to whether the contract carrier was engaged in a business impressed with a public interest.

A careful examination of our statute reveals that in most instances it provides independent regulation as to the use of the highways by common and contract carriers and when not, its provisions for each are definite and specific. While some of the independent

provisions are identical, appropriately and naturally so considering the end to be attained in the interests of the public, yet there is no uncertainty as to the regulatory scheme provided for the one and the other. As to similarity, or even identity of the provisions in the Texas statute, the court said:

"It is true that the regulations imposed upon the two classes are in some instances similar if not identical; but they are imposed upon each class considered by itself, and it does not follow that regulations appropriately imposed upon the business of a common carrier, may not also be appropriate to the business of a contract carrier."

That our statute was enacted genuinely in the interest of the safety and welfare of the public, we have no doubt. Declaring its policy, the legislature said in Sec. 1 of this Act:

"The business of operating motor trucks for hire on the highways of this state affects the interests of the public. The rapid increase in the number of trucks so operated, and the fact that they are not effectively regulated, have increased the dangers and hazards on public highways, and make more effective regulation necessary to the end that highways may be rendered safer for the use of the general public; that the wear of such highways may be reduced; that discrimination in rates charged may be eliminated; that congestion of traffic on the highways may be minimized; that the use of the highways for the transportation of property for hire may be restricted to the extent required by the necessity of the general public, and that the various transportation agencies of the state may be adjusted and correlated so that public highways may serve the best interest of the general public."

While this declaration of policy and legislative intent is not necessarily conclusive, yet certainly such a statement by a coordinate branch of our state government is entitled to a high degree of respect and credence. There appears nothing in the record to the contrary. On this score we have already said in the *Stanley Case*, supra:

"Moreover, the regulatory statute was enacted to preserve the ways, to prevent menace to present traffic, and further the safety of travelers generally."

As in *Stephenson* v. *Binford,* supra, it was held that the statute therein considered did not violate due process, applying its principles, we hold that our statute is constitutional in that regard.

There remains to be considered whether our statute effects unequal protection of the laws. Has the legislature acted arbitrarily so as to accord favoritism in the application and operation of the statute? If so, the law can not stand against the Fourteenth Amendment.

Classifications must not be arbitrary, unreasonable and unjust (*In Re John M. Stanley, Exceptant*, supra), but:

"When the classification made by the Legislature is called in question, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of the existence of that state of facts, and one who assails the classification must carry the burden of showing by a resort to common knowledge or other matters which may be judicially noticed, or to other legitimate proof, that the action is arbitrary. . . . The principle that the State has a broad discretion in classification, in the exercise of its power of regulation, is constantly recognized by this Court." *Borden's Farm Products Co. Inc.* v. *Baldwin, Comm.*, 293, U. S., 194, 209, 210, 55 S. Ct., 187, 191, 192, 79 L. Ed., 281, 288, 289.

The following rulings by the Supreme Court have pertinency:

"The equal protection clause is directed only against arbitrary discrimination; that is, such as is without any reasonable basis." *City and County of Denver et al.* v. *New York Trust Co. et al.*, 229 U. S., 123, 33 S. Ct., 657, 666, 57 L. Ed., 1101, 1124.

"The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Sunday*

*Lake Iron Co.* v. *Township of Wakefield*, 247 U. S., 350, 352, 38 S. Ct., 495.

"The specific regulations for one kind of business, which may be necessary for the protection of the public, can never be the just ground of complaint because like restrictions are not imposed upon other business of a different kind." *Soon Hing* v. *Crowley*, 113 U. S., 703, 5 S. Ct., 730, 733.

"A legislative classification may rest on narrow distinctions." *German Alliance Insurance Co. Appellant.* v. *Ike Lewis*, 233 U. S., 389, 34 S. Ct., 612, 621, 58 L. Ed., 1011, 1024.

"Class legislation, discriminating against some and favoring others, is prohibited. But legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment." *Barbier* v. *Connolly*, 113 U. S., 27, 5 S. Ct., 357, 360, 28 L. Ed., 923.

"The burden being upon him who attacks a law for unconstitutionality, the Courts need not be ingenious in searching for grounds of distinction to sustain a classification that may be subjected to criticism." *Middleton* v. *Texas Power & Light Co.*, 249 U. S., 152, 39 S. Ct., 227, 229, 63 L. Ed., 527.

"We said in that case" (*Magoun* v. *Illinois Trust & Savings Company*, 170 U. S., 283, 18 S. Ct., 594, 42 L. Ed., 1037) "that 'the State may distinguish, select, and classify objects of legislation, and necessarily the power must have a wide range of discretion.' And this because of the function of legislation and the purposes to which it is addressed. Classification for such purposes is not invalid because not depending on scientific or marked differences in things or persons or in their relations. It suffices if it is practical, and is not reviewable unless palpably arbitrary." *Orient Ins. Co.* v. *Daggs*, 172 U. S., 557, 19 S. Ct., 281, 43 L. Ed., 552.

"The practical convenience of such a classification is not to be disregarded in the interest of a purely theoretical or scientific uniformity." *Continental Baking Co.* v. *Woodring*, 286 U. S., 352, 52 S. Ct., 595, 601, 76 L. Ed., 1155.

"The fact that a statute discriminates in favor of a certain class does not make it arbitrary, if the discrimination is

founded upon a reasonable distinction. . . . Or if any state of facts reasonably can be conceived to sustain it. . . . 'If the selection or classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law.' " *State Board of Tax Commissioners* v. *Jackson*, 283 U. S., 527, 537, 51 S. Ct., 540, 543, 75 L. Ed., 1248.

Our Court has held:

"A State may classify the objects of legislation so long as its attempted classification is not clearly arbitrary and unreasonable." *Dirken* v. *Great Northern Paper Co.*, 110 Me., 374, 386, 86 A., 320, 326.

"It" (meaning the Fourteenth Amendment) "forbids what is called class legislation. . . . In a word, discrimination as to legal rights and duties is forbidden. All men under the same conditions have the same rights. Diversity in legislation to meet diversities in conditions is permissible but if in legislative regulations for different localities, classes and conditions are made to differ, in order to be valid, those differentiations or classifications must be reasonable and based upon real differences in the situation, condition or tendencies of things. Arbitrary classification of such matters is forbidden by the constitution. If there be no real difference between the localities, or business, or occupation, or property, the State can not make one in order to favor some persons over others." *State of Maine* v. *Latham*, 115 Me., 176, 98 A., 578, 579.

" 'A state may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses, and it may do so none the less that the forbidden act does not differ in kind from those that are allowed. . . . If a class is deemed to present a conspicuous example of what the legislature intends to prevent, the 14th Amendment allows it to be dealt with, although otherwise and merely logically not distinguishable from others not embraced in the law.' " *State of Maine* v. *Dodge*, 117 Me., 269, 104 A., 5, 7.

"A classification must not be arbitrary. It must be natural and reasonable. . . . It must be based upon an actual difference

in the classes bearing some substantial relation to the public purpose sought to be accomplished by the discrimination in rights and burdens. . . . If a classification, though necessarily discriminatory, stands these tests, it is not a denial of equal protection of the laws." *York Harbor Village Corporation* v. *Libby et al.*, 126 Me., 537, 104 A., 382, 387.

"One of the essential requirements" of constitutional guaranty as to equal protection of the law "is that it must be natural and not capricious and arbitrary." *In Re Milo Water Company*, 128 Me., 531, 149 A., 299, 302.

"The Fourteenth Amendment does not prevent reasonable classification as long as all within a class are treated alike. The liberty guaranteed is not freedom from all restraints, but from restrictions which are without reasonable relation to a proper purpose, and are unjustly arbitrary and discriminatory." *State of Maine* v. *Old Tavern Farm, Inc.*, 133 Me., 468, 180 A., 473, 475.

The Fourteenth Amendment "does not prevent reasonable classification as long as all within a class are treated alike. . . . It does prohibit arbitrary discrimination between persons, or fixed classes of persons, such as that based on State citizenship." *State* v. *Cohen*, 133 Me., 293, 300, 177 A., 403, 407.

"The Fourteenth Amendment does . . . forbid unjust discrimination between persons, or fixed classes of persons, but not proper discrimination based on the requirement of the commonweal." *In Re Stanley*, 133 Me., 91, 174 A., 93, 97.

We now consider the respondent's detailed attack upon the constitutionality of this statute. It must be borne in mind that discrimination alone is not sufficient to render the Act unconstitutional under the Fourteenth Amendment. In order thus to void it, its provisions must either bear no actual relation between the means and the end considering the purpose of the Act or create a discrimination, unwarranted by actual differences, so that the statute is purely arbitrary and effects legislation which unreasonably and without proper distinction favors some persons or classes over others in like circumstances. Either such lack of relationship or the presence of arbitrariness spells unconstitutionality. To prevent law-

made favoritism and to supply full measure of evenly apportioned liberty to the people of this nation was the purpose of this amendment (adopted following the Civil War), as well as to place the slaves lately freed on a parity with any person within its jurisdiction.

We shall consider only the objections raised by the respondent, for, as has been held in a case hereinbefore cited, the Court need not ingeniously exert itself to discover reasons to justify it in wrecking legislation.

1. *Exemption of one hauling his own goods:* The statute provides:

"Nothing in this act contained shall apply to persons, firms or corporations operating motor vehicles carrying property of which they are the actual and bona fide owners." Sec. 10 (A), Chap. 146, P. L. 1935.

Within the class created, that is, those hauling for themselves, it is not claimed there is any discrimination. They all fare alike. But it is contended that the statute works a discrimination against those hauling for others. Yes, but it is not arbitrary. As we view it, it is founded on actual differences. In *Stephenson* v. *Binford*, supra, the Supreme Court said:

"Nor do we find merit in the further contention that the act arbitrarily discriminates against appellants because it does not apply to persons, commonly known as 'shipper-owners,' who are transporting their own commodities under substantially similar conditions."

In the earlier case of *Continental Baking Company* v. *Woodring*, supra, Chief Justice Hughes, speaking of a similar exemption in the Kansas Motor Vehicle Act of 1931, said:

"The exemption runs only to one who is carrying his own live stock and farm products to market or supplies for his own use in his own motor vehicle."

And in sustaining the exemption, said:

"The Legislature in making its classification was entitled to consider frequency and character of use and to adapt its regu-

lations to the classes of operations, which by reason of their habitual and constant use of the highways brought about the conditions making the regulation imperative and created the necessity for the imposition of a tax for maintenance and reconstruction."

Also the court quoted with approval from the decision of the District Court in the same case (see 55 F. [2d] at page 352):

"The Legislature rightly concluded that the use of the highways for carrying home his groceries in his own automobile is adequately compensated by the general tax imposed on all motor vehicles." (Also see *Aero Mayflower Transit Co.* v. *Georgia Public Service Commission*, 295 U. S., 285, 55 S. Ct., 709, 79 L. Ed., 1439.) On the authority of those decisions, we hold this exemption valid.

*2-a.. Exemption as to fresh fruits and vegetables:* The statute exempts motor vehicles "while engaged exclusively in the transportation of fresh fruits and vegetables from farms to canneries during the canning or packing season." This likewise we do not consider arbitrary.

In *Aero Mayflower Transit Company* v. *Georgia Public Service Commission et al.*, supra, decided April 29, 1934, the Supreme Court, with an opinion by Mr. Justice Cardozo, upheld an exemption in the Georgia statute of "the transportation of live stock and farm products to market by the owner thereof or supplies for his own use in his own motor vehicle." It distinguished the case it had in hand from *Smith* v. *Cahoon*, supra, dealing with the Florida statute and on which case this respondent so strongly relies, by pointing out that the Florida statute "gave relief from its exactions to *any transportation company* engaged exclusively in the carriage of agricultural, horticultural, dairy or farm products, *whether for the producer or for anyone else.*"

Our statute, as the Florida statute, gives an exemption to motor vehicles engaged exclusively in the transportation of commodities named, regardless of ownership, and so, it is true, differs from the Georgia statute and may be said, so far, to be controlled by *Smith* v. *Cahoon*, supra; but there are other distinctions that take it out

from such control, we think, for the Maine statute exempts transportation only of fresh fruits and vegetables from farms to canneries during the canning or packing season, while the exemption in the Florida statute had not these limitations.

"The distinction between property employed in conducting a business which requires constant and unusual use of the highways, and property not so employed, is plain enough." *Alward* v. *Johnson*, 282 U. S., 509, 513, 514, 51 S. Ct., 273, 274, 75 L. Ed., 496. Also see *Hicklin et al., Appellants* v. *Coney et al.*, 290 U. S., 169, 54 S. Ct., 142, 78 L. Ed., 247 ; *Aero Transit Company* v. *Georgia Commission*, supra, on page 292, and *Schwartzman Service Co.* v. *Stahl et al.*, 60 Fed. (2d), 1034.

Thus we perceive two actual differences, disproving the claim of arbitrariness ; first, the haulings (only during the canning or packing season) are occasional and infrequent, not regular and constant, and so are less burdensome to the public highways ; and, second, limitation of the exempted commodities to fresh fruits and vegetables. It is common knowledge that the post-harvest period in Maine for transportation of these commodities from the farms to the canneries is of exceedingly short duration, due to early frosts and road conditions. The legislature may well have thought — it certainly is easily conceivable — that it would be impossible for this transportation to be effected by either common or contract carriers, or by both. Without question, the canning should be as quickly done as possible, not only to preserve freshness but to avoid possibility of infection by delay. This particular kind of transportation, then, it may be said, is truly *sui generis* and reasonably distinctive from general transportation.

The fact that the exemption does not include every sort of a perishable farm product does not necessarily make it arbitrary. The statute creates a class of transporters of fresh fruits and vegetables and all within that class are treated alike

"There is no constitutional requirement that regulation must reach every class to which it might be applied — that the legislature must regulate all or none. *Silver* v. *Silver*, 280 U. S., 117, 123, 74 L. Ed., 221, 225, 65 A. L. R., 939, 50 S. Ct.,

57. The State is not bound to cover the whole field of possible abuses. *Patsone* v. *Pennsylvania*, 232 U. S., 138, 144, 58 L. Ed., 539, 543, 34 S. Ct., 281. The question is whether the classification adopted lacks a rational basis." *Sproles et al.* v. *Binford*, 286 U. S., 374, 52 S. Ct., 581, 588, 76 L. Ed., 1167, 1183.

We hold that this classification of transporters of perishable fruits and vegetables with a limitation to seasonal haulings is natural and does not lack a rational basis. Furthermore, while it does not embrace every perishable farm commodity, as butter, eggs and milk, which come not directly from the soil, it does practically include all perishable farm products that are raised on farm lands.

2-b *Transportation of newspapers*: The statute provides "this act shall not apply to the transportation of newspapers." We do not consider this solely an arbitrary exemption. It is well defended in these words of the State's attorney:

"In this day and age the speedy dissemination of news is a matter which vitally concerns the general welfare of society. Moreover, the transportation of newspapers is not such as to wear greatly on the highways. It seems to fall, naturally, into a class by itself in the whole transportation of property scheme and the exemption is neither arbitrary nor unreasonable."

The non-inclusion of books and magazines is justified by readily conceivable distinctions. The newspaper, with its up-to-the-last-minute news, its legal notices, reports financial and weather, including forecasts, and much other information essential to present-day life, it probably is true, has no substitute in the dissemination of like reading matter possible of transportation. An exemption that permits its unlicensed conveyance by motor vehicles to every nook and corner in the state, in many instances to places not served by common, nor even by contract, carriers, is warranted. Newspapers may be separately classified without favor, for the peculiar character of the business of the newspaper publisher, the speed and frequency with which the transportation of newspapers should take place, the purposes newspapers serve and the resulting benefits to the people generally, sufficiently indicate non-similarity to the busi-

ness of publishing books and magazines, however beneficial and essential they may be regarded. It was not necessary for the legislature to regulate the transportation on the highways of all published matter or none, so long as the classification relating solely to newspapers did not lack a rational basis.

We have discussed this objection (perhaps should not), in spite of the fact that we do not see how the respondent is injured by the claimed discrimination between newspaper and other publishers, for he is neither.

"... One who would strike down a State statute as violative of the Federal Constitution must bring himself by proper averment and showing within the class as to whom the act thus attacked is unconstitutional. He must show that the alleged unconstitutional feature of the law injures him and so operates as to deprive him of rights protected by the Federal Constitution." *Standard Stock Food Company, Appellant* v. *Wright as State Food & Dairy Commissioner of Iowa*, 225 U. S., 540, 32 S. Ct., 784, 786, 56 L. Ed., 1197, 1201; *Southern Railway Co., Petitioner* v. *King*, 217 U. S., 524, 534, 30 S. Ct., 594, 54 L. Ed., 868, 871; Honnold on Supreme Court Law, Vol. 3, Page 1826, and cases cited therein.

3. *Rate exemptions*: The statute provides "there shall be exempted from the foregoing provisions as to rate regulation the transportation by motor vehicle of property . . . (3) when consisting of logs, wood or lumber moving to mills for manufacture." Chap. 146, P. L. 1935, Sec., 10 (B). It is to be noted that this does not exempt motor vehicles transporting logs, wood or lumber to mills for manufacturing from the general operation of the statute but simply relieves such transporters from the provisions as to rate regulation.

Did the legislature have the right to single out the transportation by motor vehicle of logs, wood, and lumber moving to mills for manufacture and relieve it from rate regulation by the Commission? We think it did, because we can see that that particular kind of transportation presents real differences from common carrier and other kinds of transportation, as in equipment used, the seasonal or irregular and non-constant haulings, and the apparent

inaptitude of that kind of transportation to rate regulation. These distinctions the legislature might well have had in mind. As Chief Justice Savage said, in *State* v. *Latham,* supra, "diversity in legislation to meet diversities in conditions is permissible." Also see *State ex rel Coney et al.* v. *Hicklin,* 167 S. E., 674 (S. C.), and *Stephenson* v. *Binford,* supra. The last named cases upheld an exemption for the transportation of logs and lumber from the forest to the shipping points. It would seem that if the transportation itself could be exempted without offending the Fourteenth Amendment, that the provision affording relief from rate regulation would also be reasonable and not indicate an arbitrary distinction.

It being urged that Chap. 258, P. L. 1909, entitled "An Act Relating to the Employment of Labor" was repugnant to the Fourteenth Amendment, as well as to our State Constitution, this Court in *Dirken* v. *Great Northern Paper Company,* supra, considered the business of cutting, hauling and driving logs in comparison with the pulp and paper business and held the statute constitutional because of diverse and distinctive conditions in their conduct.

4. *Exemption depending on the origin or terminus of the cargo:* Sec. 10 (A), Sub-division (1) of said Chap. 146 exempts motor vehicles "while being used within the limits of a single city or town in which the vehicle is registered by the Secretary of State or in which the owner maintains a regular and established place of business or within fifteen miles by highway in this state of the point in such single city or town where the property is received or delivered, but no person, firm or corporation may operate, or cause to be operated, any motor vehicle for the transportation of property for hire beyond such limits without a certificate of public convenience and necessity or a permit to operate as a contract carrier; nor may any such person, firm or corporation participate in the transportation of property originating or terminating beyond such limits without holding such a certificate or permit unless such property is delivered to or received from a carrier over the highways operating under a certificate or permit issued by the Commission or a steam or electric railway, railway express or water common carrier, . . ."

The validity of exemptions, first while operating wholly within a city or village, and, second, of private motor carriers operating within a radius of twenty-five miles beyond the corporate limits of

a city or village, has been passed upon and declared in *Continental Baking Company* v. *Woodring,* supra. With reference to the city or village exemption, Chief Justice Hughes, in the opinion in that case, said that it,

". . . has an obviously reasonable basis, as such operations are subject to local regulations. In protecting its highway system the State was at liberty to leave its local communities unembarrassed, and was not bound either to override their regulations or to impose burdensome additions."

Having discussed the distinctions as to the radius or zone, the town's "penumbra," the Chief Justice continued:

"We think that the legislature could properly take these distinctions into account and that there was a reasonable basis for differentiation with respect to that class of operations. In this view, the question is simply whether the fixing of the radius at twenty-five miles is so entirely arbitrary as to be unconstitutional. It is obvious that the legislature in setting up such a zone would have to draw the line somewhere, and unquestionably it had a broad discretion as to where the line should be drawn. In exercising that discretion, the Legislature was not bound to resort to close distinctions or to attempt to define the particular differentiations as to traffic conditions in territory bordering on its various municipalities."

The exemption as to property delivered to or received by certain designated carriers remains to be considered. Apparently the statute divides them into two classes, those using the highways as licensed common or contract carriers and those not ordinarily using them, although common carriers, as the steam and electric railways, the railway express and water common carrier. As to the first class, it is easily conceivable that the legislature thought that merchandise received from or delivered to it had in reality one carriage and that inasmuch as part of the transportation was done by a licensed carrier, that there was ample justification for the exemption. It might have reasoned that there was a relationship between the licensed and unlicensed carrier, as it were of agency, and that

consequently if the principal were licensed, the agent need not be or vice versa.

As to the second class, the railways (steam and electric), the railway express and water common carrier, we think that application of the law as enunciated in *Sproles* v. *Binford,* supra, warrants a holding that such a provision does not constitute an arbitrary discrimination. In that case, the statute having definitely fixed the length of motor vehicles and the weight of their loads, permitted longer vehicles to be used and heavier loads to be transported between points of origin, or destination, and 'common carrier receiving or loading' or unloading, points." The court commented upon the fact found by the District Court that the exemption related to short hauls and then said:

> "But the legislature in making its classifications was entitled to consider frequency and character of use and to adapt its regulations to the classes of operations, which by reason of their extensive as well as constant use of the highways brought about the conditions making the regulations necessary."

That, too, might have been a reason entertained by the legislature in making this exemption in our statute.

In *Sproles* v. *Binford,* supra, it was argued that the effect was to favor railroad transportation over that by motor trucks, to which the court replied:

> "The state has a vital interest in the appropriate utilization of the railroads which serve its people as well as in the proper maintenance of its highways as safe and convenient facilities. The state provides its highways and pays for their upkeep. Its people make railroad transportation possible by the payment of transportation charges. It can not be said that the state is powerless to protect its highways from being subjected to excessive burdens when other means of transportation are available. . . . We perceive no constitutional ground for denying to the state the right to foster a fair distribution of traffic to the end that all necessary facilities should be maintained and that the public should not be inconvenienced by inordinate uses of its highways for purposes of gain. This is

not a case of a denial of the use of the highways to one class of citizens as opposed to another or of limitations having no appropriate relation to highway protection. It is not a case of an arbitrary discrimination between the products carried, as in the case of *Smith* v. *Cahoon*."

Were the policy of the exemption debatable, we are not concerned with the wisdom of the legislature's decision upon it and, as said in *Stephenson* v. *Binford*, supra:

If it "so concluded, as it evidently did, that conclusion must stand, since we are not able to say that in reaching it that body was manifestly wrong. . . . Debatable questions of this character are not for the courts, but for the legislature, which is entitled to form its own judgment. *Sproles* v. *Binford*, 286 U. S., 374, 388, 389, 76 L. Ed., 1167, 1178, 1179."

"It makes no difference that the facts may be disputed or their effect opposed by argument and opinion of serious strength. It is not within the competency of the courts to arbitrate in such contrariety." *Rast* v. *Van Deman & Lewis Co.*, 240 U. S., 342, 36 S. Ct., 370, 374, 60 L. Ed., 679.

Here again we have discussed this objection — as others raised by the respondent — although we do not see how, as said in *Standard Stock Food Company, Appellant* v. *Wright as State Food & Dairy Commissioner of Iowa*, supra, "the alleged unconstitutional feature of the law injures him and so operates as to deprive him of rights protected by the Federal Constitution."

We conclude that this statute, insofar as it has been attacked by this respondent, is constitutional. In accordance with the stipulation in the agreed statement of facts, we remand the case to the Trial Court for disposition in accordance with the statute.

*Case remanded. Respondent to stand for trial.*