STATE of Maine

v.

John A. DUBE.

Supreme Judicial Court of Maine.

Dec. 31, 1979.

Horace S. Libby, Cushing W. Pagon, William E. Furber (orally), Public Utilities Commission, Augusta, John McElwee, Dist. Atty., Houlton, William J. Smith, Asst. Dist. Atty., Van Buren, for plaintiff.

Eaton, Peabody, Bradford & Veague by Daniel G. McKay, Bangor (orally), for defendant.

Before McKUSICK, C. J., and, GODFREY, POMEROY, WERNICK, ARCHIBALD, NICHOLS and GLASSMAN, JJ.

GODFREY, Justice.

Chapter 52, section 18(a) of the Rules and Regulations of the Maine Public Utilities Commission (referred to herein as "Rule 18(a)") provides as follows:

"No motor carrier under the jurisdiction of the Commission shall drive nor shall any such carrier require or permit any person to drive any motor vehicle operated under the provisions of Title 35, M.R.S.A. Sections 1551 to 1563, inclusive, unless the person so driving shall have attained the age of 21 years and shall have obtained an operator's or chauffeur's license . . . ."

Subsection (1) of 35 M.R.S.A. § 1563 makes violation of any rule or regulation of the Commission punishable by fine or imprisonment, and subsection (3) of that section makes the employee-driver himself liable to the penalties provided in subsection (1) if the motor vehicle is operated in violation of the statute or of any rule, regulation or order issued by the Commission pursuant thereto.

John A. Dube appeals from two convictions for violating Rule 18(a) by driving on two occasions a tractor trailer subject to the Commission's jurisdiction when he was only nineteen years old. His appeal challenges both the Commission's authority to impose the age requirement and the constitutionality of the requirement under the due process and equal protection clauses. He also argues that the rule was impliedly amended by section 8 of chapter 598 of the Public Laws of 1971, amending 1 M.R.S.A. § 73 (1979) by lowering the age of majority from 21 to 18 "for all purposes." We deny the appeals.

### Procedure

These were criminal proceedings, governed by the Maine District Court Criminal Rules. The penalty for violating a Commission regulation of motor carriers for hire consists of "a fine of not less that $10 nor more than $500, or by imprisonment for not more than 11 months, or by both." 35 M.R.S.A. § 1563(1). Such sanctions constitute a Class E criminal penalty, as defined in 17-A M.R.S.A. § 4-A(3)(E). The procedure in the case is therefore governed by the applicable rules of criminal procedure.

Dube's appeal presents a threshold question, namely, whether he properly waived the right to a jury trial in Superior Court pursuant to Rule 23(a), M.R.Crim.P. Rule 23(a) requires a written waiver of a jury trial by the defendant, to be approved

by the court.[1] In *State v. Smith*, Me., 365 A.2d 1036 (1976), we ruled that if there is no seasonable written waiver of a jury trial, the trial is a nullity, convictions must be vacated and a new trial ordered. Here, the record discloses no written waiver signed by the defendant. In the record, however, is a letter signed by Dube's attorney to the clerk of the Superior Court, Aroostook County, stating that Dube had agreed to submit the case on an "Agreed Statement of Facts."

In *State v. Allen*, Me., 377 A.2d 472, 475–76 (1977), we held that, for purposes of the trial of a Class D or Class E crime, the requirement of a written waiver of jury trial can be satisfied if the writing was executed by the defendant's attorney of record. Here, the wording of the letter, signed by Dube's attorney and hence legally attributable to Dube, sufficiently expresses the defendant's willingness to proceed without a jury. By application of our decision in *Allen*, we conclude that Rule 23(a) has been satisfied.

### Authority of the Public Utilities Commission

The first issue on the merits is whether the Public Utilities Commission had the authority to promulgate its Rule 18(a). Appellant argues that the statute on carriers, title 35 of the Revised Statutes, does not contain a sufficiently clear grant of authority to the Commission to prescribe an age limitation, enforcible by criminal sanctions, on drivers of carriers within the Commission's jurisdiction. In support of that argument, he contends that 29 M.R.S.A. § 530 (Supp.1979–80) constitutes a "specific finding" by the Legislature that any holder of a Class 1 operator's license is qualified to drive a tractor trailer and that nothing in the statutes authorizes the Public Utilities Commission to issue a rule that has the effect of contradicting that finding.

The extent of the Commission's authority must be determined in the light of the fact that 35 M.R.S.A. § 1563 imposes a criminal penalty for violation of Commission rules and regulations issued pursuant to the authority of chapter 93 or 95 of title 35. It is constitutionally permissible for the legislature to provide a criminal sanction for violation of rules or regulations that it has duly empowered an administrative agency to promulgate. *United States v. Grimaud*, 220 U.S. 506, 517–18, 31 S.Ct. 480, 55 L.Ed. 563 (1910); *United States v. Piatti*, 416 F.Supp. 1202 (1976); *State v. Allen*, 77 N.M. 433, 423 P.2d 867 (1967); *State v. Lambert*, 68 Wis.2d 523, 229 N.W.2d 622 (1975). See 1 Am.Jur.2d *Administrative Law* § 127 (1962 & Supp.1979); Annot. 79 L.Ed. 474, 491 (1934). The agency must be given clear standards to prevent the exercise of authority beyond the scope intended by the legislature and to assure that the citizen is protected against arbitrary or discriminatory action by public officials. *Schechter Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935); *State v. Boynton*, Me., 379 A.2d 994 (1977).

The Commission's rule-making authority for administering chapters 93 and 95 of title 35 is conferred by section 1558, the relevant part of which provides:

> "The commission shall have authority to make such rules and regulations as it deems necessary or advisable to insure proper administration and enforcement of this chapter and chapter 95 and to promote the safety of the operation of common carriers, contract carriers and interstate carriers over the highways."

The only particular aspect of safety that section 1558 refers to is the length of duty of drivers, with respect to which the section requires the Commission to conform its rules and regulations to the standards of the Interstate Commerce Commission for vehicles in interstate commerce. The section makes no explicit reference to the age of drivers or to any other particular aspects of safety of operation.

The general statement of policy announced in the opening section of chapter

---

1. See Form 20, Appendix of Forms, M.R. Crim.P.

93, namely, 35 M.R.S.A. § 1551 (1978), manifests a clear legislative purpose of improving public safety on the highways by regulating the operation of commercial carriers under the Commission's jurisdiction:

> "The business of operating motor trucks for hire on the highways of this State affects the interests of the public. The rapid increase in the number of trucks so operated, and the fact that they are not effectively regulated, have increased the dangers and hazards on public highways, and make more effective regulation necessary to the end that highways may be rendered safer for the use of the general public . . . and that the various transportation agencies of the State may be adjusted and correlated so that public highways may serve the best interest of the general public."

Other provisions manifesting a similar purpose appear in section 1552, relating to common carriers, and section 1555, relating to contract carriers, all of which are embraced within the authority granted by section 1558 to enforce the provisions of chapter 93.

The Commission has a clear mandate to administer chapters 93 and 95 in such a way as to promote the safety of operation of commercial carriers subject to its jurisdiction. In carrying out that mandate the Commission may take into consideration another legislative purpose, perhaps less plainly expressed in chapter 93, of promoting efficient performance of service on the part of carriers under the Commission's jurisdiction. The provisions governing certification of common carriers require the Commission, in determining whether to grant a certificate, to consider "the ability of the applicant efficiently to perform the service for which authority is requested," 35 M.R.S.A. § 1552 (1978), and the Commission may not grant a permit for operation of a contract carrier "unless it appears that the applicant is fit, willing and able properly to perform the service of a contract carrier by motor vehicle," 35 M.R.S.A. § 1555(3) (Supp.1979–80).

■ The legislative mandate to the Commission is thus to administer chapters 93 and 95 so as to promote public safety on the highways while assuring, by means of selective licensure, the efficient transportation of merchandise entrusted to commercial carriers under the Commission's jurisdiction. That mandate sets forth a sufficiently clear standard to determine whether the Commission has remained within the bounds of its authority in issuing Rule 18(a). To fulfill its responsibility under the mandate, the Commission may properly impose a requirement for the operation of such carriers that is reasonably related to the safety of the public and the efficient performance of service.

■ The grant of authority to the Commission in section 1558, considered in the context of the entire statute, clearly supports the Commission's requirement of a minimum age for drivers of common, contract and interstate carriers, as reasonably related to public safety on the highways and efficient performance of service by the carriers. The operator of a commercial carrier may be subject to greater pressures for haste and for driving under hazardous conditions than the ordinary motorist. In the event of a breakdown or other emergency, the quality of the operator's judgment may be crucial to the safety of other motorists and the security of the carrier and its cargo. We cannot say that some minimum age requirement higher than the fifteen years theoretically permissible for the issuance of Class 1 operators' licenses under the motor vehicle law is not a reasonable means of assuring the greater experience and maturity that the Commission finds desirable to promote safe operation and competent management of commercial carriers under its jurisdiction.

The particular choice of 21 years as an age minimum is not per se unreasonable, and it draws some support from the fact that the Federal Highway Administration has applied the same minimum to drivers of commercial vehicles operated in interstate commerce, 49 C.F.R. § 391.11, basing its regulation on statistics from private liability insurers. *See* 35 Fed.Reg. 6458 (April 22, 1970).

The Commission has experimented since 1933 with various age minima for operators of commercial carriers under its jurisdiction. In its 1933 rules, it required age 21, with special authorization possible at 19; in 1935, it provided for special authorization of persons under 21 with a chauffeur's license; in its 1937 rules, it set the minimum age limit at 18, where it remained until issuance of the Commission's 1951 rules, which permitted age 18 for operators of common and contract carriers but required 21 for operators of interstate carriers. In the Commission's rules of 1964, the present requirement of age 21 for all types of carriers was prescribed, and it has since remained in effect. Throughout the entire period, despite frequent amendments of section 1558, the Legislature has not restrained the Commission from exercising authority under that section to prescribe a minimum age limit.

The history of Rule 18(a) indicates strongly that the Commission has given serious thought through the years to the determination of an appropriate age minimum. After administering the act for many years with a minimum of 18 years, the Commission saw fit to increase that minimum to 21. In view of that history, the Commission's experience in the matter is entitled to considerable weight. We conclude that the Commission has the authority under the statute to set a reasonable minimum age limit and that its choice of age 21 is reasonable.

In reaching our conclusions, we do not overlook Dube's argument that the Commission has no authority to set a requirement for operating a motor vehicle exceeding the requirements for a Class 1 operator's license established by the Legislature in sections 530 and 538 of title 29. Section 538 of title 29 provides that no license shall be issued to any person under fifteen years of age. Section 530 defines three classes of licenses to be granted by the Secretary of State. A Class 1 license entitles the holder to operate "any motor vehicle or combination of vehicles, including 'Class 2 or 3,' except school buses, motor cycles or motor driven cycles." A "Class 1" license autho-

rizes operation of vehicles over 28,000 pounds. Dube, at the time of his arrests, held a Class 1 license.

On its face, Rule 18(a) is not in conflict with any provision of the motor vehicle law. Rule 18(a) adds to the appropriate requirement of a Class 1 operator's license a special requirement affecting only the operation of vehicles for hire placed under the Commission's jurisdiction by sections 1551 to 1563 of title 35. Nothing in the language or history of sections 530 and 538 of title 29 indicates that the Legislature intended their provisions to be exclusive. On the contrary, subsection 5(B) of section 530 provides that nothing in the section shall prevent an employer from imposing additional qualifications or requirements.

The Secretary of State is charged by 29 M.R.S.A. §§ 581–586 with the responsibility of administering examinations and other requirements for candidates for operators' licenses, general requirements designed to protect the safety of the traveling public. The Commission's responsibility is somewhat different: it is charged with promoting efficient and responsible operation of common, contract and interstate carriers on the highways, both to promote safety of the public on the highways and to serve the public interest in the safe transportation of merchandise entrusted to such carriers. That mandate distinguishes the authority of the Commission from that of the Secretary of State, and it authorizes the Commission to impose, for operation of such carriers, requirements that are reasonably related to promoting the safety of the public on the highways and the competent performance of service. The Commission's regulation of the age limit for operators of commercial carriers has not been invalid through all the years since 1933 merely because it imposed a requirement over and above that of the highest class of operator's license.

*Constitutionality*

We conclude further that the minimum-age provision in Rule 18(a) bears a rational relationship to legitimate purposes

and does not violate either the equal protection or due process clause of the fourteenth amendment. As stated in 35 M.R.S.A. § 1551, the Legislature perceives a danger that unregulated activity of commercial carriers will make the highways unsafe for the rest of the public. For reasons stated earlier in this opinion, we think the Legislature's perception is not unreasonable and that a minimum-age requirement higher than the fifteen years permissible for the issuance of an operator's license under the motor vehicle law is a reasonable means of assuring the greater experience and maturity that are desirable to promote safe and competent operation of the commercial carriers under the Commission's jurisdiction.

 An administrative regulation rationally designed to carry out a legitimate and well-defined statutory purpose does not violate the due process clause. *National Hearing Aid Centers, Inc. v. Smith*, Me., 376 A.2d 456 (1977). The equal protection clause is not violated when distinctions are drawn with rational relationship to a legitimate purpose. *State v. Clarke*, Me., 396 A.2d 228, 232 (1979); *McNicholas v. York Beach Village Corp.*, Me., 394 A.2d 264, 269–70 (1978). The difference in minimum-age requirements between ordinary drivers and drivers of commercial carriers is rationally related to the promotion of highway safety and competent commercial carrier service, both legitimate public purposes. *See Bradley v. Public Utilities Comm'n*, 289 U.S. 92, 53 S.Ct. 577, 77 L.Ed. 1053 (1933); *State v. King*, 135 Me. 5, 188 A. 775 (1936) (upholding against equal protection challenges the power of public utilities commissions to license commercial carriers). *See also Debruhl v. District of Columbia Hackers' License Appeal Board*, 384 A.2d 421 (D.C.App. 1978).

*The Change in the Age of Majority*

Dube also argues that Rule 18(a) is either in conflict with, or was impliedly amended by, chapter 598 of the Public Laws of 1971, section 8 of which amended 1 M.R.S.A. § 73 to provide as follows, effective June 9, 1972:

"The common law rule that a person is a minor to the age of 20 is abrogated and persons 18 years of age or over are declared to be of majority for all purposes." [2]

In effect, the question raised by Dube is whether the words "for all purposes" in 1 M.R.S.A. § 73 (1979) extends the scope of the reduction in age to include Rule 18(a) of the Public Utilities Commission.[3] In a dif-

2. The common law age of majority was 21, of course. The common law age of majority had been lowered to 20 by P.L.1969, ch. 433, § 8, effective October 1, 1969, enacting 1 M.R.S.A. § 73 and amending other statutes.

3. Dube relies on *New Jersey State Policemen's Benevolent Ass'n, Inc. v. Town of Morristown*, 65 N.J. 160, 320 A.2d 465 (1974), which held that a statute lowering the age of majority amended by implication a statute prohibiting employment of persons under 21 as policemen. The New Jersey trial court had found that the minimum age requirement for policemen was not tied to the legal age of majority but was rather a particular requirement for policemen, based on separate considerations. The New Jersey Supreme Court reversed, saying, after a review of the statutory history:

"While . . . not every legal distinction between those age 21 and 18 has been obliterated, the exceptions intended were specifically provided in the statute." 65 N.J. at 168, 320 A.2d at 469.

None of the exceptions dealt with policemen. A separate bill lowering the age for policemen had been under consideration by the New Jersey Legislature at the same time as the general age-lowering bill. The court concluded:

"It cannot be contended that the Legislature neglected to exclude policemen from the application of the act where specific exclusions were provided, none of which dealt with policemen, and the subject matter alleged to be excluded was being simultaneously considered." 65 N.J. at 166, 320 A.2d at 468.

Applying the canon of exclusion, the New Jersey court found that the statute must have been intended to lower every age requirement not expressly excepted from the purview of the general reduction statute.

The differences between the New Jersey statute and 1 M.R.S.A. § 73 are such as to render the *New Jersey State P.B.A.* case of little value as a precedent in construing the Maine statute. For a somewhat different approach by the New Jersey court to its age-reduction statute, see *State of New Jersey in the Interest of G.T., J.V.B., and G.D.*, 143 N.J.Super. 73, 362 A.2d 1171 (1976), *aff'd on opinion of superior court*, 75 N.J. 378, 382 A.2d 1125 (1978). *See generally* Annot., 75 A.L.R.3d 228 (1977).

ferent context, the question of implied amendment by § 73 was noted, but not decided, by this Court in *Baril v. Baril*, Me., 354 A.2d 392, 397 n. 3 (1976).

■ Besides amending 1 M.R.S.A. § 73, the Maine statute, P.L.1971, ch. 598, expressly lowered the age limit specified in many provisions of the Revised Statutes, both provisions where the stated age limit is directly related to the special status of minors[4] and provisions where such a relationship is not evident.[5] The 1971 statute did not set forth exceptions: we cannot infer, by applying the canon of exclusion, that the statute impliedly includes a particular statutory age limit because it does not come within some exception provided in the statute.[6] Considered in its entirety, the scheme of the 1971 act does not manifest a legislative purpose to lower every existing age limit in the statute books to 18. Rather, the purpose was to provide generally in section 73 of title 1 for lowering the age of majority to 18, reconciling the age provisions of the many statutes that would otherwise become inconsistent or anomalous and lowering other statutory limits only as specifically identified in the various sections of the act.

A similar approach should be followed with regard to the asserted amendment of Rule 18(a) by implication from the enactment of the 1971 statute. If it were shown that the Commission had set its minimum age limit for drivers of commercial carriers at 21 with the purpose of making that limit accord with the statutory age of majority, there would be room for argument that Rule 18(a) should come within the scope of the language "for all other purposes" in section 73. However, there is nothing to suggest that such was the case.[7] The histo-ry of Rule 18(a) and its predecessors, outlined earlier, shows clearly that in promulgating and from time to time amending the rule the Commission was not acting on the basis of the common law age of majority but on its consideration of the exigencies of driving commercial carriers, and that it borrowed the 21-year age minimum established by the federal authorities for drivers of similar carriers in interstate commerce. As a result, the minimum of 21 in Rule 18(a) was not affected by the 1971 amendment of 1 M.R.S.A. § 73.

We conclude that Rule 18(a) of the Public Utilities Commission was within the Commission's authority to promulgate, that it does not offend the Constitution either on its face or in its application here, and that it was not amended by implication or invalidated when the Legislature lowered the age of majority to eighteen.

The entry is:

Appeals denied.

Judgments affirmed.

GLASSMAN, Justice, dissenting.

I respectfully dissent.

Our constitution vests the legislative power in our state legislature. Me.Const. art. IV, pt. 1, § 1; *State v. Butler*, 105 Me. 91, 96, 73 A. 560, 562 (1909). Historically, courts had the power to designate certain behavior as criminal through the definition of common law crimes. *See, e. g., State v. Bradbury*, 136 Me. 347, 349–50, 9 A.2d 657, 658 (1939). That power was called into question in an Opinion of the Justices which quoted *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95, 5 L.Ed. 37 (1820), as follows: "[T]he power of punishment is vested in the legislative, not in the judicial

---

4. *E. g.*, P.L.1971, ch. 598, § 27, amending 18 M.R.S.A. § 3635 (*re* guardianship for retarded persons about to come of age).

5. *E. g.*, P.L.1971, ch. 598, § 74, amending 32 M.R.S.A. § 3102 (*re* qualification for license to practice physical therapy).

6. *Cf. New Jersey State Policemen's Benevolent Ass'n, Inc. v. Town of Morristown*, analyzed in note 3, *supra*.

7. Attainment of adult status has never been a requisite in Maine for a license to operate an ordinary motor vehicle. *See* P.L.1905, ch. 147, §§ 19, 20 (no age limit specified); P.L.1911, ch. 162, § 14 (16 years of age minimum); P.L.1921, ch. 211, §§ 30, 31 (15 years of age minimum for ordinary license; 18 for chauffeur's license).

department. It is the legislature, not the court, which is to define a crime, and ordain its punishment." *Opinion of the Justices*, Me., 278 A.2d 693, 696 (1971). Any question as to the residual power of courts to define common law crimes in this state was eliminated by the adoption of our new Criminal Code. *See* 17–A M.R.S.A. § 3(1). Thus, the sole agency of government possessing the constitutional power to define criminal conduct in this state is our legislature.

The separation of powers among the various branches of our government is a fundamental concept of our constitutional system. *E. g.*, The Federalist No. 47 (J. Madison). Although this doctrine is implicit in the federal constitution and in many state constitutions, separation of powers is explicitly mandated by the constitution of this state. Me.Const. art. III, §§ 1–2.

In the instant case, we are faced with a legislative delegation to the Public Utilities Commission, empowering that agency to define criminal conduct. We are not concerned with the validity of a delegation of legislative power to define conduct which may be subject to civil remedies; as to such delegations different criteria may be applicable.

In a long line of cases starting with *United States v. Grimaud*, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911), and including *McKinley v. United States*, 249 U.S. 397, 39 S.Ct. 324, 63 L.Ed. 668 (1919), *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), and *Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944), the United States Supreme Court has recognized that the Congress of the United States may define criminal behavior but leave to an administrative agency the power to fill in the details of the criminal proscription. This principle was also recognized in *Hirabayashi v. United States*, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943), where the United States Supreme Court upheld a definition of criminal conduct in executive orders of the President and in proclamations issued pursuant thereto where Congress had before it those specific executive orders and proclamations

when authorizing a criminal sanction for their violation. The Court expressly refused to consider the legitimacy of the delegation had the executive action defining the criminal conduct not been specifically approved by Congress. *Id.* at 103, 63 S.Ct. 1375, 87 L.Ed. 1774.

When we turn to a review of the authority in this state, the law is even clearer. In *State v. Boyajian*, Me., 344 A.2d 410, 412 (1975), this Court stated:

> There can be no doubt that the legislature has power to delegate proscriptive responsibility to administrative agencies. . . . When a statute is challenged for the limited reason that it lacks adequate standards . . . we have found constitutional infirmity where the act gives the agency unlimited power, is without prescribed restraints, and is devoid of criteria as a guide to such agency. (Citations omitted).

The delegation upheld in *Boyajian* was most explicit. It provided:

> The Board of Commissioners of the Profession of Pharmacy, hereinafter in this subchapter called the 'board,' may from time to time, after notice and hearing, by regulations, designate as potent medicinal substances any compounds of barbituric acid, amphetamines or any other central nervous system stimulants or depressants, psychic energizers or any other drugs having a tendency to depress or stimulate which are likely to be injurious to health if improperly used . . . . 22 M.R.S.A. § 2201.

In *State v. Boynton*, Me., 379 A.2d 994, 995 (1977), we also noted:

> As a general rule, the legislative authority must declare the policy or purpose of the law and set up standards or guides to indicate the extent, and prescribe the limits, of the discretion it is delegating.

The delegation upheld in *Boynton* specifically enumerated the kinds of regulation which might be adopted by a municipality entering into an approved shellfish conservation program. The municipality was granted permission to

enact a municipal ordinance fixing the time when clams, quohogs and mussels may be taken from any or all of the coastal waters and flats within the municipality . . .. The ordinance may provide limitations on the amount of clams, quohogs and mussels which may be taken within the municipality, and may provide that municipal licenses be required for the taking of any such species within the municipality and may determine the qualifications for the license, including residence requirements, and may fix the license fees. The ordinance may provide for the size of soft-shell clams which may be taken from the flats within the municipality. 12 M.R.S.A. § 4252 (repealed, P.L.1977, ch. 661, § 4).

The purpose of this legislation was conservation, and the statutory definition of that term provided further guidance to the municipality. *See* 12 M.R.S.A. § 3401(5–A) (repealed, P.L.1977, ch. 661, § 4).

Significantly, the delegations in *Boyajian* and *Boynton* also contained adequate procedural safeguards to assure against arbitrariness in the exercise of the delegated legislative power. *See generally* K. Davis, Administrative Law Treatise § 2.00 (Supp. 1970).

When we turn to the delegation here involved, to the extent applicable to this case it provides:

> The commission shall have authority to make such rules and regulations as it deems necessary or advisable . . . to promote the safety of the operation of common carriers, contract carriers and interstate carriers over the highways. 35 M.R.S.A. § 1558.

Nowhere does the statute enumerate the kinds of conduct that may be proscribed by the administrative agency. The only standard to restrict arbitrary action by the Commission is the vague standard of "safety." Nor does the statute contain any procedural protections to assure that the Commission makes findings after appropriate investigation and hearing to justify its conclusion that certain regulations are necessary or advisable to promote safety. Thus, the Public Utilities Commission is by this legislation granted a commission to roam at large and to adopt regulations which may be enforced by criminal penalties without guidance or restriction. In the regulation with which we are here concerned, the Commission has seen fit to impose a minimum age requirement for drivers of motor vehicles operated under the provisions of 35 M.R.S.A. §§ 1551–66. Presumably, the Commission could also adopt a regulation fixing a maximum age, a minimum or maximum height, a minimum or maximum weight, or limiting the race or sex of drivers. To assume that the minimum age requirement is justified by statistics developed in the insurance industry—which it has not been shown were ever considered by the Commission—does nothing to demonstrate the validity of this broad, unfettered delegation of authority. Presumably, insurance industry statistics may also be found that persons of a certain race or of a certain sex or of a certain size have a higher accident rate than do others.

A fundamental problem of governance in our complex society is control of the ever-increasing bureaucracy. To allow administrative agencies unfettered discretion to define criminal conduct undermines the very essence of representative government. If this delegation is upheld, there is nothing to prevent the legislature from adopting a statute that repeals the substantive provisions of our Criminal Code, delegates to the unelected Commissioner of Public Safety the power to promulgate regulations which in his opinion he deems necessary or advisable to promote the public health, safety, welfare and morals, and provides that violation of such regulations shall be punished by criminal sanctions. There could be no greater threat to democracy and liberty.

Because the purported delegation of legislative authority to the Public Utilities Commission to define criminal conduct is invalid, its regulation may not be enforced by a criminal penalty. The judgment of conviction should be set aside and the Superior Court directed to enter a judgment of acquittal.