**FRIEDMAN'S EXP., Inc. et al. v. MIRROR TRANSP. CO., Inc.**

No. 9443.

Circuit Court of Appeals
Third Circuit.

Argued May 18, 1948.

Decided Aug. 19, 1948.

Edgar Watkins, of Atlanta, Ga. (Edmond J. Dwyer, of Newark, N. J., on the brief), for appellant.

John B. Siefken, of New York City (McCauley & Henry and Thomas A. Brennan, all of New York City, on the brief), for Hears Corporation, amicus curiæ.

Parker McCollester, of New York City (Frederick M. Porter and Lord, Day & Lord, all of New York City, on the brief),

for American Newspaper Publishers Ass'n, amicus curiæ.

August W. Heckman, of Jersey City, N. J., for appellee.

Before BIGGS, McLAUGHLIN, and KALODNER, Circuit Judges.

BIGGS, Circuit Judge.

The question presented by the appeal at bar is a narrow one: Is the transportation of comic sections of The New York Sunday Mirror from Wilkes-Barre, Pennsylvania, to points in New York and in New Jersey, within the exemption conferred by Section 203(b) (7) of Part II of the Interstate Commerce Act, 49 U.S.C.A. § 303(b) (7), which provides, "Nothing in this chapter * * *[1] shall be construed to include * * * motor vehicles used exclusively[2] in the distribution of newspapers * * *". The transportation involved is from the printer in Wilkes-Barre to the office of the Mirror in New York City and to the Mirror's wholesale outlets in New York and New Jersey in delivering the comic sections to retailers who assemble the comic sections with other portions of the Sunday newspapers for sale to the public.[3] The appellants, one of which, Friedman's Express, Inc., performed the transportation service in question prior to the engagement of the appellee, Mirror Transportation Co., Inc., complained in the court below that the ap-

pellee had not obtained a certificate for the transportation from the Interstate Commerce Commission and sought an injunction. The trial court, proceeding to final hearing on affidavits, refused the injunction and dismissed the suit on the ground that the appellee's vehicles were used exclusively in the distribution of newspapers. See D.C., 71 F.Supp. 991. The appeal at bar followed.

It is argued that while a comic section is a part of a newspaper it is not in fact a newspaper which today consists of many parts or sections; that a comic section is no more a newspaper than a sweatband is a hat or unassembled automobile parts are in fact an automobile. The appellants insist that the word "distribution" used in clause (7) of the subsection must be deemed to have a very different meaning than the terms "transportation" or "transporting" generally employed in the same subsection in respect to exemptions.[4] "Distribute", say the appellants, means to give out or divide a commodity among a number and its synonym is "allot" but "transportation" means to carry or convey a commodity from one place to another:[5,6] consequently, since comic sections are not newspapers and must be combined with other sections to form newspapers, the service performed by the appellee was transportation to places of processing and was not distribution which requires the allotment or division of the newspapers

---

[1] The exception as to safety provisions which follows the word "chapter" is not pertinent in the instant case.

[2] No contention is made that the vehicles used by the appellee were not employed exclusively in the service described.

[3] The court below filed no separate findings of fact and conclusions of law, nor did it set out in its opinion any pertinent finding on this point as required by Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, and therefore this court has no finding of fact before it on this issue. The statement of fact in our opinion is culled from the appellants' brief which states that the "pertinent facts are undisputed."

We take this occasion to point out again the desirability of literal compliance by the trial courts of this circuit

with the provisions of Rule 52(a).

[4] Clause (1) of Section 203(b) will serve as an example, viz., "motor vehicles employed solely in transporting school children * * *." The clauses of the subsection use the words "transporting" or "transportation" throughout except in clause (6) "motor vehicles used in carrying property * * *." consisting in the main of live stock or agricultural products, and (7), the clause under discussion.

[5] These definitions, cited by the appellants, were procured from Funk & Wagnalls New International Dictionary.

[6] The appellants cite State v. King, 135 Me. 5, 23, 24, 188 A. 775, 785, which points out the public interest in the speedy and unlicensed "transportation" of newspapers by motor vehicle. The case is not apposite or really helpful to either side in the present controversy.

to or among the public. At least we so apprehend the appellants' argument.

Little light is thrown on the use of the word "distribution" in Section 203(b) (7) by the legislative history. It appears that the Wheeler bill, which later, as amended, became the Motor Carrier Act, Part II of the Interstate Commerce Act, contained no provision for exemption of motor vehicles engaged in carrying newspapers. S. 1629, 74th Cong., 1st Sess. (1935). Representatives of the American Newspaper Publishers' Association had come before the Committee on Interstate and Foreign Commerce and requested exemption of vehicles carrying newspapers from any regulation which might tend to interfere with the speed and fluidity of deliveries. See Hearings before the Committee on Interstate and Foreign Commerce, House of Representatives, 73rd Cong., 2nd Sess., on H. R. 6836, A Bill to Regulate the Transportation of Passengers and Property in Interstate and Foreign Commerce by Motor Carriers Operating on the Public Highway and for Other Purposes, pp. 379–387 (1934). The House Committee print of S. 1629, June 26, 1935, carried an exemption reading, "9. Motor Vehicles while used exclusively in the distribution of newspapers or periodicals." In a later print of the same bill, July 20, 1935, the phrase "or periodicals" was omitted. The ninth exemption became the seventh exemption and apparently has since remained as now written. The sub-committee report on S. 1629, 74th Cong., 1st Sess. (1935), signed by Representative Samuel B. Pettingill as chairman, carried the following statement, "Your sub-committee has seen fit to add to the exemption under this bill, a provision exempting trucks engaged 'exclusively in the handling of livestock and unprocessed agricultural products; also newspapers'. There was some question as to whether or not they would be included in the casual hauler exemption." This amendment was agreed to in the House on July 31, 1935. See Cong.Rec., Vol. 79, Part 11, at p. 12220. This is the sum of pertinent information that the parties have been able to offer or we have been able to obtain respecting the origin of clause (7) of the subsection. In respect to this legislative history, the appellants assert that it is evident from it that Congress intended to exempt the "final distribution" of newspapers.

We do not agree and conclude that the judgment of the court below must be affirmed. It would be of small value to attempt a definition of the word "newspaper" in this opinion. Several definitions have been cited to us.[7] We shall not attempt a definition other than to say that a typical modern Sunday newspaper embraces not only comic sections but financial sections, news sections, sports sections, magazine sections, and various special supplements. These may relate to book reviews or to world events[8] or be in the form of the "Sunday Mirror Magazine"[9] which begins with an article "Final Regal Rites for Exotic 'Radiant Jade'" and ends with an essay on crime called "13 Steps in Central Park". The field of a modern newspaper is as broad and catholic as the field of its readers. Some members of the public seem to regard the comic strip as the newspaper rather than as part of a newspaper.[10]

---

[7] They vary from that of Words and Phrases, 1st Series, Vol. 5, p. 4792: "A newspaper is defined by Webster as a sheet of paper, printed and distributed at stated intervals, for conveying intelligence of passing events, advocating opinions, etc.; a public print that circulates news, advertisements, proceedings of legislative bodies, public announcements, etc. Burrill Law Dictionary defines it as a 'paper or publication issued in numbers at stated intervals, conveying intelligence of passing events.'" to that contained in the National Encyclopedia, Vol. 7, p. 271: "A publication containing chiefly news of current events, feature articles and advertising, and issued at fixed intervals, usually daily, semi-weekly, or weekly." The first definitions are the more conservative; the last, the broader.

[8] See for example the "New York Times Book Review" and the "New York Times Magazine".

[9] Issue of May 16, 1948.

[10] In this connection we offer as an interesting exhibit of Americana the following excerpt from p. 12 of the appellee's brief which states what we believe to be simple facts: "That the public actually awaits the issues of the comic section was best illustrated some

■ We think that Congress did not intend to make a fine-spun distinction between the distribution of newspapers and parts or sections of newspapers. The word "newspapers" used in the statute in our opinion was intended to embrace all or any of the component parts of a modern newspaper, each equally important to various public groups and to embrace the whole or any section thereof which is ready in form to be brought into the hands of the public.

■ Next, we conclude that it is unnecessary, in this case at least, to define the distinction between "transportation" and "distribution" even if we accept the limited meaning which the appellants would impose upon the latter word. We think that appellee's service meets the test of distribution, for the transportation of the comic sections from Wilkes-Barre to New York City, to the Mirror office and to other wholesale points in New York and in New Jersey, is a clearly defined step in the distribution of the New York Sunday Mirror. In short, the appellee's service is transportation but it is also distribution in that finished sections of the newspaper are thereby started on the road which brings them ultimately, and at no very distant point either in space or in time, into the hands of the public.

We note that the Interstate Commerce Commission, Division 5, at No. MC–10843,[11] in an opinion dealing primarily with a collateral matter,[12] stated, "Although we conclude that applicant [the appellee herein] has failed to establish that its proposed operation would be consistent with the public interest and the national transportation policy, it may, under the provisions of section 203(b) (7) of the act continue its present service in the transportation of newspaper supplements from Wilkes-Barre to New York, N. Y., New Brunswick, Newark, Elizabeth, North Bergen and Jersey City, N. J., so long as its vehicles are used exclusively in that service." The opinion of the Commission on the very question before us, albeit expressed by way of dictum, confirms our own view.

The judgment of the court below will be affirmed.

---

years ago when the Boston Traveler decided to eliminate 'Somebody's Stenog'. The switchboard was hopelessly tied up for twenty-four hours by irate customers. The cartoonist who draws Winnie Winkle once asked for suggestions for Winnie's clothes and he received more than 15,000 replies. When Blondie was expecting 'Cookie', the second child of the Bumsteads, Chic Young thought it would be a great idea for Blondie to ask suggestion for a name. There followed a deluge of over 40,000 letters flooding the editors of member papers. When Milton Caniff dreamed up a scene showing the death of Raven Sherman in 'Terry and the Pirates' he was deluged with mail offering sympathy. A number of letters were accompanied by beautiful floral offerings. The impact of Raven's death affected the entire nation. One Pennsylvania paper, which did not carry the strip, published Raven's death as a front page item. Students at Loyola University at Chicago gathered on the campus the day Raven was buried in the hills north of Chunking, and paid tribute to the late heroine by facing East for a moment of silence. Caniff was finally forced to go on the radio and explain Raven's death. When Orphan Annie's dog Sandy became lost, the artist received a wire from Henry Ford: 'Please do all you can to help Annie find Sandy. We are all interested.'"

[11] This report will not be printed in full in the permanent series of Motor Carrier Reports of the Commission.

[12] The attempt of the appellee to gain a certificate of public necessity to operate as a contract carrier from certain points in New York and New Jersey to Wilkes-Barre to the end that its motor vehicles would not have to return empty to Wilkes-Barre.