EASTERLING *v*. COOK.

Opinion delivered November 28, 1927.

1. COUNTIES—DISPOSITION OF INTEREST ON SINKING FUND.—Interest derived from the sinking fund raised by taxation for the purpose of paying a compromised bonded indebtedness pursuant to Acts 1895, p. 167, constitutes "property of the county," and is subject to disposal by the quorum court, such interest not being within the inhibition of Const., art 16, § 11, there being no provision in the act for lending the sinking fund, and interest derived therefrom comes from a source not contemplated in the act.

2. COUNTIES—AUTHORITY OF QUORUM COURT.—The quorum court has authority to appropriate money to pay the expenses of the county judge in going to Washington, D. C., for the purpose of attempting to obtain restoration of Federal aid for road building in this State, which had previously been withdrawn, and which withdrawal materially affected the road work within the county.

Appeal from Chicot Chancery Court; *Pat Henry,* Special Chancellor; affirmed.

· *R. W. Wilson* and *J. R. Parker,* for appellant.

*J. C. Gillison* and *Streett & Burnside,* for appellee.

HUMPHREYS, J.   This is a suit brought in the chancery court of Chicot County by appellant, a resident landowner and taxpayer in said county, for the benefit of himself and all other taxpayers in the county, to recover from appellees, officers of the county, $42,934.56 alleged to have been illegally diverted by them from the compromise loan bond fund, which was a fund raised by taxation for the purpose of paying the compromised bonded indebtedness of said county to the general revenue fund and to other funds, and used in repairing the courthouse, buying records, constructing bridges and buying in general county warrants, and for $500 alleged to have been misappropriated and paid out of the county general revenue fund and used by one of the appellees, Harry E. Cook, for the purpose of taking a trip on a special train, known as "Arkansas on Wheels," to Washington, D. C.

Appellees filed an answer, denying that the $42,934.14 expended by them for the purposes alleged in the complaint was a part of the fund raised by taxation for the payment of the compromise bonded indebtedness, but that same was derived from a different source, and was legitimately expended by appellees as officers of the county; and that the item of $500 was properly appropriated and expended for the necessary conduct of the county government.

The case was submitted to the court upon the pleadings and testimony adduced at the trial, which resulted in a decree dismissing appellant's complaint for want of equity, from which is this appeal.

The record reflects the following facts:  In 1895 the Legislature passed Act No. 114, authorizing any county in the State to refund its bonded indebtedness. This act provided that any county issuing bonds for said purpose should also provide for a levy and collection of an annual tax sufficient to pay the annual interest on such funding bonds as they became due and to create a sufficient sinking fund for the payment of the principal when it became due.   It also provided that the treasurer of the county might purchase one or more of the funding

bonds at any time he had sufficient funds arising from the tax to do so, in case the purchaser thereof would sell same. It also provided that the fund arising from the tax should be held and deemed an inviolable sinking fund for the purpose of extinguishing said indebtedness, and to be used for no other purpose.

In 1909 the quorum court of Chicot County proceeded under said act to refund its old bonded indebtedness of $246,600. The refunding bonds were made payable on July 1, 1929, and a tax of five mills was levied from year to year upon all the property in the county to pay the semi-annual interest accruing upon the bonds and to retire the bonds at maturity. A resolution was adopted creating a sinking fund board, consisting of the county judge, county clerk, and the county collector of said county, and directing that funds derived from the special tax as it accrued should be turned over to said board and loaned out by it, to the best interest of the county. The fund derived from the special tax was turned over annually to the sinking fund board by the treasurer of the county, which was loaned to certain banks in said county by said board at five per cent. interest per annum, and, at the time of the trial of this cause, interest on said fund in the sum of $71,348.51 had been earned and collected. All the fund, including the special taxes collected and the accumulated interest, was held and kept together and loaned from time to time to the banks by said board.

Harry E. Cook, one of the appellees, was county judge of said county from 1906 to 1916, during which time the old bonded indebtedness was refunded, and was a member of the sinking fund board that received from the treasurer the compromise sinking fund and loaned same to the banks. In 1916 he went out of office, was reelected in 1920, and again assumed the duties of office in 1921. From that time on he has served the county in the capacity of county judge by election. George Elder, also an appellee herein, has served the county in the capacity of county clerk by election for sixteen years.

W. J. Splawn, also an appellee herein, has served the county as its treasurer by election since January 1, 1917.

When Harry E. Cook assumed the duties of county judge, it was ascertained that about $80,000 in county warrants were outstanding against the general revenue fund, and, in addition to making other provisions to rehabilitate the general revenue fund, which was greatly depleted, so much so that scrip was worth from forty-five to fifty cents on the dollar, it occurred to him that a part of the interest which had been derived from lending the compromise bonded sinking fund might be used to purchase a part of the outstanding warrants and to make necessary repairs on the courthouse, to buy necessary records, and to construct bridges, leaving sufficient in said fund to pay the interest on the compromise funding bonds and to retire them at maturity, and at the same time reduce the five-mill levy materially. He revealed this information by letter to the circuit judge, prosecuting attorney and grand jury, and received their written indorsement of his plan. The plan was published, so that the citizens throughout the county became cognizant of it. He then recommended the plan to the quorum court, which authorized him to use the fund for the purposes outlined. Pursuant to the authority thus vested in him, he appointed the county clerk and the county treasurer trustees to purchase the outstanding warrants which could not be redeemed with money received from other sources, to the amount of $26,375.62, which they purchased for eighty cents on the dollar, using $21,029.14 of the interest in the compromise bond sinking fund in the purchase thereof. Thereafter, pursuant to the same authority, sums amounting to $21,905 were used out of the interest in said fund to repair the courthouse, buy certain records, and construct certain bridges in the county. The method used was to transfer the amounts needed out of the compromise sinking fund to the general revenue fund and such other funds as was necessary in order to expend the money for the purposes designed. The total amount transferred was $42,934.14. The with-

drawal of this amount of interest from the fund lacked $28,413.95 of absorbing all of the interest which had accumulated by lending the fund. The tax fund itself remained intact, except that it was in the hands and under the control of the sinking fund board, instead of being in the hands of the treasurer, where it lawfully belonged. As we read the record, there is practically enough left in the fund to take care of the interest as it matures on the funding bonds, and will be enough in the fund to retire the bonds at maturity. The result was obtained by the adoption and practical operation of the plan suggested by Judge Cook, notwithstanding the quorum court reduced the levy for the compromise bond sinking fund in 1922, 1923 and 1924 to 3 mills, and in 1925 to 2 mills. The transfer of the portion of the accumulated interest of this fund to other funds for the purposes outlined had the effect of rehabilitating the finances of the county, until scrip is exchanged in the market for face value, or thereabouts.

At the October term of the quorum court in 1923 it appropriated $500 to pay the expenses of Judge Cook to Washington, D. C., to confer with the Federal Road Department with reference to the restoration of Federal aid for the building of public roads in Arkansas, which the Government had theretofore withdrawn.

Appellant contends that appellees rendered themselves personally liable for transferring the $42,394.14 from the compromise bond fund to the general revenue fund and other funds for the purposes of buying county warrants, repairing the courthouse, buying records and building bridges, because the transfer of such funds by said officers was contrary to § 11, article 16, of the Constitution of 1874, and § 8 of act 114 of the General Assembly of 1895. Section 11, article 16, of the Constitution of 1874 provides that "No tax shall be levied except in pursuance of law, and every law imposing a tax shall state distinctly the object of the same; and no moneys arising from a tax levied for one purpose shall be used for any other purpose."

Section 8 of said act 114 provides that the taxes levied and collected "shall be held and deemed an inviolable sinking fund for the purpose of extinguishing such county indebtedness, and for no other purpose." It will be observed that the inhibition in both the Constitution and the act referred to is against the use of the money for any other purpose than that for which it was levied and collected, and not against the use of the interest derived therefrom for other purposes. No provision was made in the act for lending the sinking fund, so the interest derived therefrom came from a source not contemplated in the act. Appellees loaned the sinking fund in violation of the law and at their own peril. Had the money been lost in the lending, they would have been personally responsible for every dollar, and the treasurer, who was the proper custodian thereof, would have been responsible on his official bond for the return of the money. The fruit of the sinking fund derived from illegally lending same was not derived from the levy and collection of the special tax, which the Constitution and act prohibited from being used for any other purpose than that for which same had been levied and collected. It was entirely separate and distinct, and derived by an illegal act of the officers of the county, appellees herein, and necessarily became the property of the county. Being the property of the county, the quorum court had a right to place it in any fund it chose, for use by the county. The undisputed testimony shows that it was transferred from the compromise bond sinking fund to other funds and used for county purposes. Although the interest was mingled with the sinking fund which had been raised by taxation, it was not of such character that it could not be easily separated. There is no difference in the value of the dollars derived from the different sources, and the exact amount derived from each source was known. The record reflects that the amount transferred from the compromise bond sinking fund and used for other legitimate county purposes was much less than the accumulated interest thereon at the time of the transfer. Only a por-

tion of the accumulated interest was transferred from the compromise bond sinking fund, a sufficient amount being left therein to take care of the semi-annual interest accruing on the refunded bonds and to retire the bonds at maturity, even though the five-mill levy was reduced in 1922, 1923 and 1924 to three mills, and in 1925 to two mills.

We do not think that appellant's contention that the quorum court had no right to appropriate $500 to pay the expenses of Judge Cook to Washington, D. C., is tenable. At the time this appropriation was made, the Federal Government had withdrawn Federal aid from the public roads in Arkansas, which materially affected the road work in Chicot as well as other counties in the State. According to the record, the purpose in sending Judge Cook to Washington, along with other representatives of the State, was to obtain a restoration of Federal aid for road building in this State. Under the circumstances we think it a permissible expenditure for Chicot County to have made.

No error appearing, the decree of the chancery court is affirmed.

Mr. Justice KIRBY dissents.

Mr. Justice MEHAFFY concurs.