MAINE SCHOOL ADMINISTRATIVE
DISTRICT NO. 15 et al.

v.

Harold RAYNOLDS, Jr., Commissioner,
et al.

Supreme Judicial Court of Maine.

April 16, 1980.

Argued Jan. 14, 1980.

Decided April 16, 1980.

Verrill & Dana, Michael T. Healy (orally), Portland, for School Administrative Dist. No. 15.

Drummond, Woodsum, Plimpton & MacMahon, P. A., Harry R. Pringle (orally), Portland, for School Administrative Dist. No. 24.

Waldemar G. Buschmann, Asst. Atty. Gen. (orally), Augusta, for defendants.

Before McKUSICK, C. J., and WERNICK, GODFREY and ROBERTS, JJ.

WERNICK, Justice.

We have before us appeals from a judgment of the Superior Court (Cumberland County) taken by plaintiff, Maine School Administrative District No. 15 (MSAD No. 15) and intervenor plaintiff, Maine School Administrative District No. 24 (MSAD No. 24).[1] The judgment adjudicated that the plaintiff and the intervenor plaintiff lacked legal right to retain for their own unrestricted use the income earned from the temporary investment by each of them of the unused portion of proceeds derived from capital outlay school construction bonds issued under the statutory program of state aid for school construction (20 M.R.S.A.

---

1. MSAD No. 15 instituted action, seeking a declaratory judgment and an injunction, on December 19, 1977. MSAD No. 24 was permitted to intervene in the action on January 18, 1979.

§§ 3457–61). The judgment also denied the permanent injunction sought by the Districts to enjoin the defendants, Harold Raynolds, Jr., Commissioner of the Department of Education and Cultural Services, and the State Board of Education, from reducing, by the amount of the net income each District had earned by its temporary investment of bond proceeds, the school construction aid the state was obligated to pay to the plaintiff and the intervenor plaintiff.

The principal issues raised by the appeals focus upon the provisions of 20 M.R.S.A. § 3457, and of related legislation and regulations, regarding the financing of those public school construction projects approved by the State Board of Education prior to July 1, 1977.

We deny the appeal of plaintiff MSAD No. 15 and affirm the judgment insofar as it adjudicated against MSAD No. 15 and in favor of defendants, although our reasoning in support of this conclusion differs from that of the Superior Court Justice.

However, because of special circumstances in regard to the intervenor plaintiff MSAD No. 24 indicating that it might have the benefit of an equitable estoppel, we set aside the judgment of the Superior Court insofar as it adjudicated against MSAD No. 24 and remand the case as to it to the Superior Court for further proceedings concerning the issue of equitable estoppel.

The pertinent facts have been stipulated.

In January 1974, plaintiff MSAD No. 15 received from the State Board of Education the approvals making it eligible, pursuant to 20 M.R.S.A. § 3457, to receive financial aid from the state in the construction of a new high school. The inhabitants of the District subsequently authorized the directors of the District to issue bonds to raise up to $2,800,000 for use as capital outlay. On October 11, 1974, the State Board, in accordance with 20 M.R.S.A. § 3458, granted the application of MSAD No. 15 for state school construction aid of $2,800,000, and the District thereafter issued capital outlay bonds in the amount of $2,575,000. During the period the school was being constructed, the District made temporary investments of the bond proceeds not being used to defray expenses. As of December 16, 1977, the investment had produced interest of $116,928.78 and subsequently additional interest has been earned. None of the income thus realized has ever been spent by MSAD No. 15.

Intervenor plaintiff MSAD No. 24 received the State Board of Education approvals rendering it eligible for state school construction aid, pursuant to 20 M.R.S.A. § 3457, during January of 1974. In elections held in February and December of that year the inhabitants of the District authorized the directors of the District to issue capital outlay bonds for school construction totalling $5,650,000. By March 28, 1975, the State Board of Education, in accordance with 20 M.R.S.A. § 3458, had issued approvals to MSAD No. 24 for school construction aid totalling $5,498,700. On March 19, 1975 and October 15, 1975, the District issued capital outlay bonds in the amounts of $5,310,000 and $185,000 respectively. During the period of school construction MSAD No. 24 made temporary investments of the bond proceeds while they were not being used. It had realized $289,927.09 in interest as of December 28, 1978 when it intervened in this action. Having credited this income to its general budget, MSAD No. 24 spent most of it—all but approximately $57,000—in budget years 1976–77 through 1978–79.

In February, 1977 the State Board of Education notified the plaintiff, and sometime later the intervenor, that upon the filing of final construction reports and the completion of audits, (conditions precedent to the payment of any financial assistance under 20 M.R.S.A. § 3457), the Board would reduce the state aid payments to each District, respectively, by the amount of the income it had earned by its temporary investment of unused bond proceeds. The State Board relied on its "Policy XII", which was issued January 15, 1976, effective the following day, as the basis for requiring such reduction. Included in Policy XII were the following provisions:

"C. . . . Proceeds from the bond sale shall be used immediately to pay short term principal and interest costs. Unused portions of the bond proceeds shall be reinvested at all times in such manner as to be fully secured with as high rate of return as possible. Income from the reinvestment of unused bond proceeds shall be applied toward the interest costs of temporary borrowing.

"D. The difference between the income from reinvesting unused portions of bond proceeds and the interest costs for temporary borrowing shall be applied toward the next interest payment or principal and interest payment listed on the debt retirement schedule filed with the Department until the difference is depleted.

"H. Interest earned from the time the SBA–1 is filed to the next interest or principal and interest payment is due may be retained for local school use.

"I. Effective Date: This policy shall be effective January 16, 1976 except that the Commissioner is authorized to grant exceptions to this policy in cases where its implementation causes hardships on individual projects."

The Districts challenge · the legality of these provisions of Policy XII, contending that (1) they lie outside the scope of such regulatory power as was lawfully delegated to the State Board by the legislature, and (2) they are inconsistent with the purposes manifested generally in the state program of financial aid for school construction, as well as with those purposes particularly reflected in 20 M.R.S.A. § 3457. In addition, the Districts claim that Policy XII must be held inapplicable to them; to apply it to them would make the regulation retroactive and in this instance the legislature has not conferred power on the State Board of Education to regulate with retroactive effect. A further contention, made by the intervenor plaintiff MSAD No. 24, is that because it spent most of the income it derived from the temporary investment of the bond proceeds (while they were not being used) in reliance on written representations of the Associate Commissioner of Education that Policy XII was inapplicable to it, defendants should be held equitably estopped to apply the policy to the amounts of interest thus spent.

### 1.

The Superior Court Justice concluded that the correct interpretation of the statutes under consideration is that the *legislature itself mandated* the reduction in school construction aid imposed here by defendants. In support of this view defendants call to our attention various provisions in the comprehensive statutory scheme for school aid construction. They refer, for example, to the express statement in 20 M.R.S.A. § 3457 that the allocating of financial assistance shall be to

"provide further incentive for the establishment of larger School Administrative Districts."

This statement, they argue, implies that the interest derived from the temporary investment of construction bond proceeds while they are not being used must be applied to reduce the amount of reimbursement from state funds, since thereby state funds are made available to be spread to more districts and construction projects. In addition, defendants maintain that the overall statutory scheme manifests legislative intendment that the state program of financial assistance for school construction projects should not result in a "windfall" to a particular District which receives state assistance. This objective is reflected in the requirement, in Section 3457, that all federal funds (other than federal revenue sharing funds) be deducted before "computing the eligible expenditure of any administrative unit for construction aid", as well as in the statutory directives that units receiving state construction aid shall carry fire insurance and allied coverage on the completed project, shall use the insurance proceeds for repairs in the event of damage, and shall not receive subsidy on those proceeds. Similarly, specifically as to projects with financing approved under 20 M.R.S.A. § 3460, the legislature has expressly mandated that those units receiving "advance" payments shall invest any portion of the

advances not required for immediate disbursement, as well as that an amount equal to any interest earned on such investment "shall be deducted from any balance of construction aid payable to the unit on the project."

However, we regard these arguments as cutting against, rather than supporting, the point the defendants seek to make. The arguments show that where it was the legislature's purpose to establish *its own mandate* for reductions in particular instances and respects in the amount of state construction aid to be paid to a local administrative unit, the legislature knew how to accomplish its objective by resort to language which expressly, directly, plainly and specifically conveyed the legislative intendment. We deem the particular subject of the temporary investment by school districts of the proceeds of capital outlay bonds not required for immediate disbursement for project expenditures, as well as the reduction of state financial assistance by the amounts earned from such investments, to be matters too important, were it the legislative intendment to impose its own mandate regarding them, for the legislature to have left such intendment to be derived by implication, indirection or analogy. We think that were it the legislative intendment to impose *this particular* mandate, the legislature, having abundantly demonstrated in similar contexts that it knew precisely how to do it, would have stated the mandate in express, direct, specific and plain language.

■ We conclude, therefore, that defendants' argument that Policy XII as promulgated by the State Board of Education, is harmonious with, and would tend to effectuate the overall purposes of, the entire legislative program of state aid for school construction fails to establish that the legislature itself mandated that policy *to the exclusion of any other.* In the absence of language expressly, plainly and specifically stating such a particular legislative mandate, the point that Policy XII is consonant with, and tends to effectuate, the purposes of the state's program of financial assist-ance for school construction shows at most that the legislature may have authorized the promulgation of Policy XII as a *permissible administrative implementation* of that generalized statutory program.

Moreover, we disagree with an alternative rationale relied on by the Superior Court Justice, that "general principles governing bonding for public purposes *dictate* " (emphasis added) application of the investment income as Policy XII prescribes. In two of the cases cited by the Justice in this regard the issue of investment income was not involved. We look upon another case cited, *Union County Park Commission v. Board of Chosen Freeholders of Union County*, 6 N.J.Misc. 654, 142 A. 428 (1928), as tending to support the position of the School Districts insofar as it holds that where bonds were sold through the County for the benefit of the Park Commission, the Park Commission—not the County—was entitled to the income derived from investment of the bond proceeds.

The last case relied on by the Superior Court Justice, *Lynn v. Longview*, 15 Wash.2d 528, 131 P.2d 164 (1942) we find plainly distinguishable from the case at bar. There, for the making of localized improvements, municipalities were empowered by statute to create local improvement districts which were authorized to issue bonds to raise the proceeds to finance the improvements. Statute further required that at the time of the creation of a local improvement district and of the issuance of bonds therefor, assessments be levied and apportioned against the real property within the district, payable annually, to raise monies to be applied to retire the bonds. Statute further required that the monies produced by the assessments be

"kept in special funds for the sole purpose of paying principal and interest of . . . [the bonds issued by the] local improvement district." *Id.*, 131 P.2d at 166.

In addition, statute provided that bonds issued by a local improvement district

"shall not be general obligations of the city [which created the local improvement district], and . . . the holders

thereof must look exclusively to the funds made up of payments of the local improvement district assessments." *Id.*, 131 P.2d at 167.

Because of these statutory provisions establishing the monies derived from the assessment as a special fund dedicated to the "sole purpose of paying principal and interest of . . . [the bonds of a] local improvement district", Washington case law had settled that the

> "local improvement district assessments collected by the municipality constitute a trust fund for the benefit of the holders of the bonds." *Id.*, 131 P.2d at 166.

The issue involved, and decided, in *Lynn v. Longview, supra,* was whether the City of Longview or the bondholders were entitled to interest earned from the investments of monies constituting *this trust fund* for the benefit of bondholders. The Court decided the issue, fundamentally, on basic principles of trust law, saying:

> "Since the assessments collected in each local improvement district constitute a trust fund held by the city, as trustee for the benefit of the bondholders of that district, it seems . . . , logically, to follow that the interest earned on such assessments is also impressed with a like trust. All increase in the value of a trust fund derived from investment or reinvestment returns or from interest earned on the fund, belongs to, and becomes a part of, the corpus of the trust estate in the absence of some specification to the contrary in the instrument or the statute creating the trust." *Id.*, 131 P.2d at 166.

The situation in the case at bar is obviously far different. Here, the issue relates *only* to the interest earned on the proceeds produced by the bonds themselves, as derived from the bondholders' purchase of the bonds, *not* to any *independent special fund otherwise derived and required to be held, as a form of security*, against default in payment of the principal and interest due bondholders. Plainly, here, the proceeds raised by the issuance of the bonds are intended to be *spent*, to pay for the costs of the projects which were financed by is-

suance of the bonds, *not* to be retained as a security fund to protect either the bondholders against default in the payment of the principal and interest due them under the bonds, or anyone else.

Patently, then, the factor which is the foundation of the *Lynn v. Longview* decision is absent in the case at bar. Here, we have *no special trust fund* at all to call into play the "logic" of trust law that in the absence of special provisions to the contrary, as the court correctly stated in *Lynn v. Longview,*

> "interest earned on the fund, belongs to, and becomes a part of, the corpus of the trust . . . ." *Id.*, 131 P.2d at 166.

Here, rather, the issue we face concerns interest earned on the monies raised by the issuance of the bonds as to which—absent, as here, special provisions of the bonds themselves or in the statutes governing the issuance of the bonds—the controlling "logic" derives from the law of debtor and creditor; in usual effect the bondholder, by purchasing an issued bond, becomes a lender of money to the issuer of the bond as debtor. Just as a debtor, absent particular arrangements, has no legal obligation arising from his status as debtor specially to retain and dedicate for the benefit of the creditor, or anyone else, any of the money borrowed, so the debtor has no such legal obligation regarding any increment he derives from his investment of the borrowed money.

We therefore agree with the School Districts that absent a mandate prescribed by statute or by lawful administrative regulation to the contrary, they would be entitled to the benefit of the interest earned on the temporary investment of bond proceeds while they are not being used to defray construction expenses. *See Easterling v. Cook*, 175 Ark. 574, 299 S.W. 1009 (1927); *Marr v. Southern California Gas Co.*, 198 Cal. 278, 245 P. 178 (1926).

Since we have already concluded that there is no statutory mandate to the contrary, we turn to consider whether such a mandate has been imposed by lawful administrative action.

### 2.

It is beyond dispute that Policy XII promulgated by the State Board of Education expressly and plainly establishes an administrative mandate that construction aid payments to a School Administrative District shall be reduced by the amount earned from that District's temporary investment of proceeds of the bonds. The issues, then, are: (1) whether Policy XII was lawful administrative action, as lying within the scope of powers actually delegated by the legislature, consistent with constitutional requirements; and (2) whether Policy XII is lawful as applied to the instant Districts whose school construction projects were in process prior to January 16, 1976, the effective date of Policy XII.

■ The constitutional requirements for a valid legislative delegation of regulatory power to an administrative body have been discussed by this Court on several occasions, e. g., in *Kovack v. Licensing Board*, 157 Me. 411, 173 A.2d 554 (1961); at length in *City of Biddeford v. Biddeford Teachers Association*, Me., 304 A.2d 387 (1973); and most recently in *State v. Dube*, Me., 409 A.2d 1102 (1979). The basic requirement, as articulated in *Biddeford Teachers Association*, is that there be "sufficient standards—specific or generalized, explicit or implicit" to guide the agency in its exercise of authority, *id.*, at 400, so that (1) regulation can proceed in accordance with basic policy determinations made by those who represent the electorate and (2) some safeguard is provided to assist in preventing arbitrariness in the exercise of power.

Here, the State Board of Education was granted regulatory authority under 20 M.R.S.A. § 223. At the time Policy XII was adopted the statute provided:

"Subject to this chapter and sections 1901, 1902, 3456, 3457 to 3460 and 3711 to 3716, the State Board of Education may make such reasonable regulations as it may find necessary for carrying out the purposes, provisions and intent of these sections." [2]

The utilization of this regulatory power is specifically limited by 20 M.R.S.A. § 51(3), which enumerates among the powers and duties allocated to the State Board of Education the responsibility to "approve projects for state construction aid." Findings the Board must make in issuing such approvals are set out at 20 M.R.S.A. § 3458. Among them is a finding that:

"[t]he proposed project and the authorized method of financing it are in the best interest of the State and the administrative unit."

In making that determination, as well as the other findings required, the Board may be guided by the language of the provisions explaining the alternative methods of financing through state construction aid. In this case, the School Districts received approval for construction aid under 20 M.R.S.A. § 3457. That section includes provisions to the effect that the allocation of state financial assistance on school construction be in accord with the purpose to "provide further incentive for the establishment of larger School Administrative Districts . . . ." The section also requires that before any such assistance shall be paid, the School District must file a report with the Commissioner, in a form specified by him to include certain financial information, some of which is listed in the statute, the rest to be determined by the Commissioner. These reports are to provide the information necessary for the Commissioner to determine the total amount of funds to be paid to the Districts and to apportion them out of the "moneys appropriated" in accord with the statute.

These, and other, standards to guide the State Board in determining the content of its regulations, are supplemented by the statutory requirement that the Board comply with certain procedural safeguards in promulgating regulations. Although the Maine Administrative Procedure Act, 5 M.R.S.A. §§ 8001 *et seq.* was not in effect

---

**2.** Compare the grant of regulatory power in issue in *State v. Dube*, Me., 409 A.2d 1102 (1979).

at the time Policy XII was adopted, the provisions of 1 M.R.S.A. §§ 401, *et seq.* requiring notice and open meetings were in effect, and there is no evidence that these were not complied with in the promulgation of Policy XII.

■ All of the foregoing statutory provisions provide adequate standards for administrative regulation and make the delegation of power in 20 M.R.S.A. § 223 consistent with constitutional requirements.

We must address, then, whether Policy XII, as promulgated, was within the authorized scope of the powers the legislature conferred on the State Board of Education.

20 M.R.S.A. § 223 gives ample authority to the State Board of Education to fill in the interstices of the school construction finance legislation by regulations effectuating "the purposes, provisions and intent" of the comprehensive statutory program of state aid for school construction.

In our prior analysis rejecting the contention of defendants that the legislature mandated what Policy XII purports to effectuate administratively, we discussed the purposes and intent of the statutory program. Ante, at 526–527.

■ In light of those purposes and intent we conclude that it is an authorized, and reasonable, administrative implementation of the program to tie the state's offer of payment of all debt service costs to a requirement that the unit receiving that benefit reduce the state's burden by the amount of interest yielded by the temporary investment of bond proceeds while they remain unused to pay for project costs—the bond proceeds being funds the unit would not have had available to it were it not for the state's promise of reimbursement as the foundation for the issuance of the bonds. Even though the possibility cannot be excluded that the legislature might fail to appropriate sufficient funds to meet the state's reimbursement obligations, *see*

*Cohen v. Ketchum*, Me., 344 A.2d 387, 399 (1975), it is nevertheless the basic reality that

"[o]nce approval is forthcoming, reimbursement is contemplated as mandatory and automatic", *id.*, at 399,

and that were the legislature to refuse to make necessary appropriations, the courts may be called upon to enforce the state's obligation. *Cohen v. Maine School Administrative District No. 71*, Me., 369 A.2d 624, 626 (1977). Given such enforceable obligation of the state, it would be far-fetched to hold Policy XII unreasonable because it would prevent the Districts from keeping the interest earned on the unused bond proceeds as a reserve for payment of the principal and interest due the bondholders—more particularly since the Districts have no legal obligation, and indeed have made no commitment, to hold the interest earned on the temporary investment of bond proceeds (while they are unused) as a dedicated reserve to protect against the eventuality that the legislature may not appropriate the funds to enable the state to honor its assistance obligation.

In sum, by requiring the investment of unused bond proceeds and the deduction of the amount any interest thus earned from the funds reimbursed, Policy XII not only assures the full payment of debt service without reliance on any of the usual revenue sources or existing funds of the School Districts; it also prevents any individual unit from obtaining a "windfall": a benefit accruing only to the individual District but paid for by all the state's taxpayers.[3]

■ The Districts make a further contention that Policy XII is unauthorized because the State Board failed to make a prior formal finding under 20 M.R.S.A. § 223, which grants the State Board authority to

"make such reasonable regulations as it may find necessary for carrying out the

---

**3.** For example, debt service for MSAD No. 15's construction project is funded in part by the Uniform Property Tax. The District was assessed only $121,000 for debt service for fiscal year 1976 and fiscal year 1977, but it was entitled to $609,927.08 in reimbursement for the same period. See letter from Associate Commissioner Larry N. Pineo to Superintendent Gerald K. Burns, MSAD No. 15, February 18, 1977.

purposes, provisions and intent of these sections."

This issue may not be open for review in these appeals since nothing is before us showing that it was raised in the Superior Court. Assuming arguendo, however, that the question may be considered, we see no violation of the section. Although a formal statement as to why the Board deemed the Policy "necessary" might be desirable, we conclude that the section does not require express formal findings to that effect. The promulgation of the regulation implies that the agency found the rule "necessary" to carry out the provisions involved—"necessary" in this context meaning not "indispensable" but rather "convenient" or "helpful" in effectuating the purposes of the Act. And, as we have already explained, our conclusion is that as a matter of law Policy XII meets this requirement.

The remaining question, within the general challenge of the instant Districts against the lawfulness of Policy XII, is whether it is in excess of the State Board's delegated authority to apply Policy XII to them. They maintain that such application of Policy XII gives it retroactive effectiveness, and the Board lacks authority to regulate retroactively. The Districts supplement this contention with the argument that in the original promulgation of Policy XII the Board indicated that it did not intend the Policy to apply to them, lest it thereby be rendered of retroactive effect, as shown by the language of Policy XII itself and the Statement in Administrative Letter No. 64 (issued to the School Districts along with Policy XII) that: "This policy will not apply to projects for which bonds were sold as of January 16, 1976."

■ Putting aside for the moment Administrative Letter No. 64, we find nothing in the language of Policy XII itself indicating that it would not apply to the income from temporary investments of bond proceeds of MSAD No. 15 or No. 24. Policy XII states that it shall be effective January 16, 1976, and provision D provides that

"[t]he difference between the income from reinvesting unused portions of bond proceeds and the interest costs for temporary borrowing shall be applied toward the next interest payment or principal and interest payment listed on the debt retirement schedule filed with the Department until the difference is depleted."

As of January 16, 1976, MSAD No. 15 and MSAD No. 24 still had in possession the interest each had earned from the temporary investment of bond proceeds while not yet used to defray construction costs. Thus, the application of Policy XII to require that the investment income *still in the possession* of the Districts be applied to reduce debt retirement payments *to be made by the State after the effective date of the regulation* does not cause the regulation to be improperly retroactive in effect merely because the interest affected had been earned prior to the effective date of Policy XII.

■ The simultaneous issuance of Administrative Letter No. 64 suggesting an interpretation which would exempt certain projects from the operation of the regulation, although it was an indication of the opinion of at least one state education official at the time, did not have the force of law. An administrative official's statement as to the intendment of a regulation may be entitled to deference if it is not obviously inconsistent with the regulation or otherwise plainly erroneous. *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 413–414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945); Davis, *Administrative Law Treatise*, 2d Ed. Vol. 2 § 7.22. In the present case, however, we are presented with conflicting expressions of intendment: one as indicated by Associate Commissioner Pineo's Administrative Letter No. 64, issued January 16, 1976, and his letter of January 29, 1976 to the Superintendent of MSAD No. 24; the other stated in the letter to MSAD No. 15 of February 18, 1977 and another letter of similar import to MSAD No. 24, and asserted in these proceedings by the defendants as the definitive administrative position. To the extent, therefore, that the Associate Commissioner's expression of intendment may

ever have had any validity, it must now be taken as having been superseded. Since we conclude that the State Board's now definitive position is consistent with the textual language of Policy XII, which we have determined to be lawfully authorized, we hold that it may lawfully be applied to MSAD No. 15 and MSAD No. 24, unless, and except to such extent as, equitable estoppel may be invoked against defendants to preclude such result.

### 3.

We turn, then, to the issue of equitable estoppel asserted only by the intervenor plaintiff MSAD No. 24 on the ground that after Policy XII became effective it relied upon official representations of Associate Commissioner Pineo that Policy XII would not apply to it and, so relying, spent most of the net interest it had earned from its temporary investment of school construction bond proceeds.

At the outset of analysis, we stress that the estoppel issue comes before us on appeal in a posture in which we lack the benefit of any findings by the Justice of the Superior Court as to the *facts* that in this case would bear upon those elements the law holds essential to give rise to an equitable estoppel. *See Baker v. Associated Transport, Inc.*, Me., 411 A.2d 384, 386 (1980); *Roberts v. Maine Bonding & Casualty Company*, Me., 404 A.2d 238, 241–42 (1979); *Pino v. Maplewood Packing Company*, Me., 375 A.2d 534, 539 (1977); *Milliken v. Buswell*, Me., 313 A.2d 111, 119 (1973). Neither do we have the benefit of the Superior Court Justice's evaluation, as a mixed factual and legal determination, of how those essential legal elements would apply to facts found.[4]

In this case, then, we can finally dispose of the merits of the equitable estoppel issue at the appellate level only if we can decide it on the merits in favor of one side or the other *as a matter of law.*

■ We conclude that the record before us does not permit such a disposition. Although further fact-finding evaluation may not be necessary as to reliance by MSAD No. 24 since that has been stipulated, we think the record leaves open to factual assessment in light of the totality of the circumstances whether the reliance was justified. Moreover, even though it is undisputed that MSAD No. 24 spent most of the net interest it had earned by its temporary investment of school construction bond proceeds, the record indicates issues of fact that remain unresolved regarding exactly for what purposes the interest was spent and, more particularly, whether or not it was spent either (1) in discharge of obligations that, in any event, MSAD No. 24 was otherwise legally required to meet or (2) in other ways for which MSAD No. 24 would not have chosen to spend the monies were it necessary that they be raised by increasing taxes. All of these unresolved matters are factual issues bearing on whether MSAD No. 24 suffered a real detriment in consequence of its reliance on the official representations by Associate Commissioner Pineo.[5]

Since we thus conclude that we cannot decide the merits of the equitable estoppel issue in favor of one or the other of the opposing sides as a matter of law, we must address a separate issue which could result

---

**4.** On the Superior Court Justice's rationale of decision, which we have not accepted, that the legislature itself had mandated what Policy XII purports to effectuate administratively, it was not necessary that the Justice address the equitable estoppel claim on its factual and legal merits. He was able to dispose of it on the independent legal ground that equitable estoppel cannot be invoked to require a governmental official or agency to take action in violation of law established by the legislature.

**5.** We may note, too, that Policy XII itself provides that "the Commissioner is authorized to

grant exceptions to this Policy in cases where its implementation causes hardships on individual projects." Depending upon what a fact-finding inquiry may reveal regarding the nature of the detriment to MSAD No. 24, if any, it might be that further fact-finding inquiry could indicate that any detriment suffered could be ameliorated by a flexible application of Policy XII to MSAD No. 24, thereby to avoid the necessity of bringing to bear so extreme a remedy as the bar resulting from the application of an equitable estoppel.

in a disposition of the equitable estoppel issue, as a matter of law, in favor of the defendants. This other issue arises because the defendants are a government official and a governmental agency acting in the discharge of governmental functions. The question arises, then, whether under the law of Maine application of equitable estoppel is prohibited *absolutely* wherever it is sought to be applied to the actions of any governmental official or agency in the discharge of any governmental function.

If in the development of the common law it was held that equitable estoppel could never be applied against any governmental official or agency acting in the discharge of any governmental function, the law now prevailing in most jurisdictions rejects so absolutistic an approach. See appropriate cases collected in Davis, *Administrative Law of the Seventies*, §§ 17.01 *et seq.* (1976 and 1980 Supp.).

This Court has previously decided that equitable estoppel may not be invoked against a governmental official or agency in the discharge of responsibilities regarding taxation, the paramount function of government by which it is enabled to exist and function at all. *A. H. Benoit & Company v. Johnson*, 160 Me. 201, 202 A.2d 1 (1964); *Dolloff v. Gardiner*, 148 Me. 176, 91 A.2d 320 (1952); *Town of Milo v. Milo Water Company*, 131 Me. 372, 163 A. 163 (1932). This Court, however, has not previously decided that equitable estoppel may never be applied solely on the ground that the activity against which it is invoked is that of some governmental official or agency discharging some governmental function. To the contrary, there have been intimations by this Court that equitable estoppel may be asserted against particular governmental officials or agencies acting in the discharge of particular governmental functions. *See Roussel v. State*, Me., 274 A.2d 909, 926 (1971); *Boutet v. Planning Board of City of Saco*, Me., 253 A.2d 53, 56 (1969). ▋ We now squarely decide that under the law of Maine the application of equitable estoppel is *not absolutely* precluded solely because it is invoked against activ-

ity by a governmental official or agency in the discharge of a governmental function. The law of Maine is, rather, that depending on the totality of the particular circumstances involved, which will include the nature of the particular governmental official or agency acting and of the particular governmental function being discharged as precipitating particular considerations of public policy, equitable estoppel may be applied to activities of a governmental official or agency in the discharge of governmental functions.

With the law of Maine in this regard thus definitively established we, as an appellate tribunal, cannot say on the record before us that as a matter of law equitable estoppel should, or should not, be applicable to the particular governmental activity involved in this case and the particular governmental official and agency named as the defendants. This is so, first, because more extensive fact-finding regarding all the circumstances, as previously discussed herein, will assist in the general judgmental balancing of public policy considerations relative to fairness and justice. Second, more particularly since the intervenor plaintiff MSAD No. 24 seeking to impose equitable estoppel is itself a governmental agency sharing a common responsibility with defendants to discharge the governmental function of furthering public education, the public policy considerations, and the public interest, could weigh in the balance on both sides and thereby cancel out, leaving the application of equitable estoppel for determination in accordance with the demands of fairness and justice as if the controversy were between non-governmental parties.

▋ We, therefore, conclude that as to intervenor plaintiff MSAD No. 24, the case must be remanded to the Superior Court for its consideration, guided by this opinion, of the question whether, and if so to what extent, equitable estoppel should bar defendants from enforcing Policy XII against intervenor plaintiff MSAD No. 24.

Moreover, since it is in this case that this Court has had occasion for the first time to discuss in some detail the issue of the appli-

cation, in general, of equitable estoppel against governmental officials or agencies acting in the discharge of governmental functions and, more particularly, the scope of the problem where, as here, it is a governmental agency which is seeking to apply equitable estoppel against governmental action of another governmental official and agency, we conclude that in fairness to all parties, as well as for the benefit of the Justice who will preside over the further proceedings on remand, the consideration of the equitable estoppel issue on remand need not be confined to the evidentiary record as heretofore made. In those proceedings plaintiff MSAD No. 24, and the defendants may, as any of them may see fit, present additional relevant evidence.

The entry is:

(1) The appeal of plaintiff MSAD No. 15 is denied, and as to plaintiff MSAD No. 15 the judgment of the Superior Court in favor of the defendants is affirmed.

(2) The appeal of intervenor plaintiff MSAD No. 24 is sustained; as to intervenor plaintiff MSAD No. 24 the judgment of the Superior Court in favor of the defendants is set aside, and the cause is remanded to the Superior Court for further proceedings confined to the issue of equitable estoppel in accordance with the opinion herein.

All concurring.