Majority: SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, and HUMPHREY, JJ.
Dissent: JABAR, J.
ALEXANDER, J.
[¶ 1] John F. Murphy Homes, Inc. (Murphy Homes), appeals from a judgment entered in the Business and Consumer Docket (.Horton, J.) granting summary judgment in favor of the State on John F. Murphy Homes’s complaint seeking recovery on the grounds of breach of contract, quantum meruit, and equitable estoppel, among other equitable remedies.[1] We affirm the judgment. Because the breach of contract and quantum meruit claims are not legally viable, we focus our analysis on the equitable estoppel issue.
I. CASE HISTORY
[¶ 2] The following facts are derived from the parties’ statements of material fact, viewed in the light most favorable to John F. Murphy Homes, Inc., the nonpre- *923 vailing party. Estate of Smith v. Cumberland Cty., 2013 ME 13, ¶ 2, 60 A.3d 759.
[¶ 3] Murphy Homes operates a Special Purpose Private School. The services it offers to its students, which are either medical or educational, are paid generally in two ways. For the medical services it provides, Murphy Homes bills MaineCare directly. MaineCare is the State Medicaid program, administered by the Department of Health and Human Services (DHHS). See 22 M.R.S. § 3173 (2016). It is funded by the State and federal governments: the federal. government covers two-thirds of costs, 'and the State pays one-third. The State’s one-third contribution to Maine-Care is commonly referred to as the “Seed” because the federal government’s obligation to pay originates with the State’s promise to cover one-third of the costs. The rate at which Murphy Homes may bill for the medical services it provides is established by MaineCare regulations stated in the MaineCare Benéfits Manual.
[¶ 4] During the time at issue, Murphy Homes executed at least three provider agreements with MaineCare: in 1998, in 2001, and in 2009. Each of the agreements contains provisions requiring Murphy Homes to comply with all relevant state and ’ federal laws, including regulations contained in the MaineCare Benefits Manual. In accordance with procedures outlined in the Manual, Murphy Homes was to submit claims for payment to DHHS concerning the medical services it provided.
[¶5] Under the federal Medicaid program, DHHS reimbursed providers for approximately one-third of their eligible costs, and the federal government was to pay, through DHHS, the remaining two-thirds. Pursuant to the Manual, after Murphy Homes submitted, a claim, DHHS would send Murphy Homes a remittance form indicating the amount billed during that billing cycle, the “allowed” portion of the amount billed,.and the amount DHHS was actually paying. If Murphy Homes believed that it was underpaid on any given claim, it was required to invoke, within 120 days, the review procedures specified in the Manual. See 14 C.M.R. 10 144 101-1-20, § 1.12 (2014).
[¶ 6] For the educational services it provided, Murphy Homes charged tuition to the entity that referred the child to its programs — either the public school district, the child’s parents, or the Department of Education. The Maine Department of Education (DOE) set Murphy Homes’s yearly tuition rate based on the Cost Accounting and Rate Establishment System (CARES) report Murphy Homes submitted each year. In each CARES report, Murphy Homes was to document its costs in providing educational services for that year.
[¶ 7] Sometime in 2001, Murphy Homes’s Chief Financial Officer (CFO) received and reviewed Murphy Homes’s first payment and remittance form for medical expenses from DHHS. The CFO noticed that Murphy Homes was being paid an amount less than the amount denoted as “allowed” on the form. The CFO called DHHS to inquire about the discrepancy, and was informed by a DHHS employee that the difference between the amount “allowed” and the lower amount actually paid was the Seed, or the State’s portion of MaineCare funding. The DHHS employee indicated that the Seed was not to be paid by DHHS, but rather it was “in the tuition.” Although the costs at issue were for medical services rather than educational services, the CFO believed what’ the DHHS employee told him.
[¶ 8] In the summer of 2002, the CFO spoke with the DOE employee responsible for calculating tuition rates, who confirmed *924 that Seed payments representing the State’s share of the allowed medical expenses were added to the tuition rates set by DOE for educational expenses. The record does not suggest that, after those few conversations with DHHS and DOE employees, there were any further conversations with State employees about payment amounts for nearly a decade, until 2011. During all of this time, Murphy Homes continued to receive payments and payment documentation that demonstrated on the face of the documents that Murphy Homes was receiving payments in amounts less than Murphy Homes believed it was entitled to receive.
[¶ 9] Because the CFO believed that the Seed payments were already included in DOE tuition calculations, he did not include the Seed amount in the CARES forms he submitted to DOE for educational expenses. Despite his decision to omit the Seed information from CARES reports, the CFO believed that the Seed was being paid by DOE in part .because Murphy Homes was approved for tuition rates for educational expenses that were higher than the operating costs it submitted on the CARES forms.
[¶ 10] Although the tuition rates' calculated by DOE were higher than Murphy Homes’s educational operating costs, the rates were never high enough to cover both the Seed and the educational operating costs. The CFO believed that this discrepancy was the result of DOE including the entire Seed amount in the tuition rates but approving less than Murphy Homes’s total annual educational costs. Despite noting the- underpayments apparent on the remittance forms, Murphy Homes never invoked the 120-day administrative review procedure.
[¶ 11] In reality, the State had not been paying the Medicaid Seed. At some point in 2011, the State, through DHHS, advised Murphy Homes that it would begin to pay “the full rate.” The State’s announcement regarding full payment prompted Murphy Homes’s officials to investigate its history of reimbursement under the MaineCare program. This investigation led Murphy Homes’s staff to conclude that there was “no way [Seed] could have been part of the tuition.”
[¶ 12] On April 12, 2013, Murphy Homes filed a complaint with the Superior Court that was subsequently transferred to the Business and Consumer Docket. Murphy Homes’s complaint, as construed by the trial court, stated claims for breach of contract, quantum meruit, and an equitable claim for unjust enrichment or equitable estoppel. See Fn. 1. Murphy Homes alleges that it is owed approximately $7.5 million for Seed payments not paid between 2001 and 2011.
[¶ 13] After a period of discovery, the State moved for summary judgment on all claims: The trial court granted the State’s motion, concluding that Murphy Homes’s claims for breach of contract were barred because it failed to properly invoke the payment review process provided in the MaineCare regulations. Further, the court determined that Murphy Homes could not utilize equitable estoppel to prevent the State from relying on the 120-day deadline provided in the Manual, because Murphy Homes’s reliance on the statements of State employees that the Seed payments were included in tuition rates for educational expenses was unreasonable as a matter of law. Finally, the court dismissed Murphy Homes’s remaining claims for unjust enrichment and quantum meruit, concluding that the claims were barred pursuant to the doctrine of sovereign immunity. Murphy Homes timely appealed. See M.R. App. P. 2(b).
*925 II. LEGAL ANALYSIS
A Contract and Quantum Meruit Claims
[¶ 14] Compliance with the terms of a contract is, as the trial court determined, a predicate for a breach of contract claim. The MaineCare Benefits Manual, incorporated in Murphy Homes’s provider agreements, establishes the terms of the contract between DHHS and Murphy Homes. The regulations governing the MaineCare program are codified in 14 C.M.R. 10 144 101, eh. 101. The regulations cover various aspects of the program-provider relationship, including conflicts surrounding payment. Section 1.12 provides that in the event of a perceived underpayment, the aggrieved provider must request a review within 120 days, or claims are waived:
If a provider believes an underpayment has been made for covered services rendered, based upon policy and procedures as described in this Manual, the provider should accept and cash the check issued for the services provided. The provider must request a review of payments, using the MaineCare Adjustment Request form, within one hundred and twenty (120) days of the remittance statement date or waive any right to a review of that payment.
14 C.M.R. 10 144 101-1-20, § 1.12 (2014).
[¶ 15] Here, Murphy Homes failed to properly invoke the payment review process provided in the MaineCare regulations. As the trial court accurately held, “the State’s contractual duty to pay does not extend to claims not presented in that manner.” Based on that reasoning, the trial court properly determined that Murphy Homes’s contract claim failed.
[¶ 16] Absent legislative authorization waiving sovereign immunity, an action to recover money from the State is barred by sovereign immunity, see Drake v. Smith, 390 A.2d 541, 543 (Me. 1978). Athough the State may waive sovereign immunity and be sued when it enters into a contract pursuant to a statute granting it authority to do so, id., this waiver is limited to actions arising out of a breach of that contract, and not alternative theories of recovery such as quantum meruit — also called “quasi contract” or “implied contract,” see id. at 545-46. See also Runnells v. Quinn, 2006 ME 7, ¶ 10, 890 A.2d 713 (quantum meruit as “implied contract”); Danforth v. Ruotolo, 650 A.2d 1334, 1335 & n.2 (Me. 1994) (quantum meruit as “quasi contract”). Exceptions to sovereign immunity are strictly construed, with immunity the rule and any exceptions narrowly interpreted. See New Orleans Tanker Corp. v. Dep’t of Transp., 1999 ME 67, ¶ 5, 728 A.2d 673; Lovejoy v. State, 544 A.2d 750, 751 (Me. 1988). The trial court properly determined that the quantum meruit claim was barred by sovereign immunity.
B. Equitable Estoppel
[¶ 17] The undisputed facts establish that the MaineCare Benefits Manual requires that any provider disputing amounts received as reimbursement from the State seek administrative review of those disputes within 120 days after the date of the questioned remittance statement is received from the State. Here, the discrepancies between amounts claimed to be due and amounts paid first occurred during fiscal year 2001 — between July 1, 2000, and June 30, 2001. The discrepancies in payments continued for over ten years until reimbursement practices were changed by DHHS sometime during fiscal year 2011 — between July 1, 2010, and June 30, 2011.
[¶ 18] During this period, the CFO of Murphy Homes recognized that “Seed” funds were not being paid by DHHS, but, based on a few conversations with state employees, did not include the unpaid Seed *926 amounts in Murphy Homes’s CARES reports filed with the State “for most, if not all, of the approximately ten years at issue.” The record also establishes, without dispute as to material fact, that the payment discrepancies between amounts billed and amounts paid were reflected in remittance statements sent to Murphy Homes by the State, and that, as the trial court observed, “it was obvious throughout the years in question that [Murphy Homes] was not being paid Seed.”
[¶ 19] At no time during that ten-fiscal-year period did Murphy Homes invoke the established administrative review process after receiving remittance statements that, on their face, demonstrated that the so-called “Seed” was not being paid. Rather than invoke the established administrative review process, Murphy Homes sat on its hands for nearly thirteen years before filing suit on April 12, 2013.
[¶20] In these circumstances, application of the doctrine of equitable estoppel to allow Murphy Homes to attempt to recover the $7.5 million that it now claims it was underpaid is particularly inappropriate.[2] Beyond ignoring the 120-day- review requirement throughout the ten years of underpayments, $3.7 million of the sum that Murphy Homes now seeks to recover would have been paid in the seven years before April 12, 2007, outside of the six-year statute of limitations, 14 M.R.S. § 752 (2016), that limits equitable, tort, or contract actions.
■ [¶ 21] “At common law, it was held that equitable estoppel could never be applied against any governmental official or agency acting in the discharge of any governmental function.” City of Auburn v. Des grosseilliers, 578 A.2d 712, 714 (Me. 1990); accord Me. Sch. Admin. Dist. No. 15 v. Raynolds, 413 A.2d 523, 533 (Me. 1980). In Desgrosseilliers and Raynolds, we moved away from an absolute prohibition of the application of equitable estoppel to actions by governmental entities, instead holding that equitable estoppel may be applied to governmental agencies “depending on the totality of the particular circumstances involved,” with the circumstances including the nature of the particular governmental official or agency acting, the government function being discharged, and appropriate considerations regarding public policy. Raynolds, 413 A.2d at 533; accord Desgrosseilliers, 578 A.2d at 714.
[¶ 22] Summary judgment, although characterized as entitlement to judgment as a matter of law, may be granted in actions involving claims for equitable relief, such as Murphy Homes’s equitable estoppel claim, when “(1) there is no genuine issue of material fact affecting either the equitable claims or the equities to be considered in deciding to take action, and (2) the opponent of the motion has been afforded sufficient opportunity to present affidavits or other sworn evidence and legal arguments.” Hutz v. Alden, 2011 ME 27, ¶ 11, 12 A.3d 1174; Univ. of Me. Found, v. Fleet Bank of Me., 2003 ME 20, 1120, 817 A.2d 871; see also Town of Falmouth v. Long, 578 A.2d 1168, 1171 (Me. 1990). Thus, a summary judgment in an action in equity itfill be reviewed in the light most favorable to the losing party to determine whether the record supports the trial court’s decision that there was no genuine issue of material fact and that the trial court did not abuse its discretion in *927 granting or denying the equitable relief requested by the moving party. See Hutz, 2011 ME 27, ¶ 12, 12 A.3d 1174.
[¶ 23] To prevail on an equitable estoppel claim against a government entity, the proponent of the claim must demonstrate by “clear and satisfactory” evidence that (1) the statements or conduct of a governmental official or agency induced the party to act, or here, to fail to act; ,(2) the reliance was detrimental to the party; and (3) the reliance was reasonable. Dep’t of Health & Human Servs. v. Pelletier, 2009 ME 11, ¶ 17, 964 A.2d 630.
[¶ 24] Here, the trial court properly rejected the equitable estoppel claim because Murphy Homes’s reliance on isolated statements by two state employees more than a decade before the action was initiated, when alleged underpayments were apparent in documentation regularly received and reviewed over the course of the decade, was unreasonable as a matter of law. In particular, Murphy Homes’s dependence on those statements as a basis for its decision not to invoke the 120-day review process was insufficient as a matter of law to meet the “clear and satisfactory” evidence standard for generating a trial-worthy issue of fact on the reliance element of its equitable estoppel claim. See id. (quoting Dep’t of Human Servs. v. Bell, 1998 ME 123, ¶ 8, 711 A.2d 1292). The State was therefore entitled to a summary judgment. See M.R. Civ. P. 66(c).
The entry is:
Judgment affirmed.

. The complaint does not state separate counts or causes of action: "[Murphy Homes] is legally and equitably entitled to be paid ... under multiple alternative remedial approaches, including but not necessarily limited to accounting, restitution and damages.” In an earlier order denying the State’s motion to dismiss, the trial court limited Murphy Homes to pursuing "the following legal theories and no others: breach of contract; quantum meruit; unjust enrichment; and violation of the federal and state statutes and rules alleged to require the State to pay state matching funds or 'seed[.]’ ” The trial court’s order appealed from also viewed Murphy Homes’s complaint as pursuing an equitable estoppel claim.

. According to the complaint and other documents in the record, the actual amount in dispute is $7,475,277. The trial court indicated that the difference between what Murphy Homes billed and what it was paid was $4.6 million from April 10, 2007, through March 31, 2011, and $3.7 million from fiscal year 2001 to April 10, 2007, a total of $8.3 million. This opinion will use the $7.5 million figure.